IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| F STREET INVESTMENTS, INC. | § | |
| A TEXAS CORPORATION F/K/A | § | |
| HYGEIA DAIRY COMPANY | § | |
| | § | |
| v. | § | CIVIL ACTION B-02-001 |
| | § | |
| SOUTHERN FOODS GROUP, L.P. AND | § | |
| SUIZA FOODS CORPORATION | § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Respectfully submitted,

JERRY L. BEANE
Attorney-in-Charge
State Bar No. 01966000
Southern Dist. Bar No. 8993
KAY LYNN BRUMBAUGH
State Bar No. 00785152
Southern Dist. Bar No. 21341
STRASBURGER & PRICE, L.L.P.
901 Main Street, Suite 4300
Dallas, Texas 75202
(214) 651-4300
(214) 651-4330 (Telecopier)

AND

EDUARDO R. RODRIGUEZ
State Bar No. 17144000
Southern Dist. Bar No. 1944
ALISON KENNAMER
State Bar No. 112804000
Southern Dist. Bar No. 12023
RODRIGUEZ, COLVIN & CHANEY
1201 East Van Buren
Brownsville, Texas 78522
(956) 542-7441
(956) 541-2170 (Telecopier)

**ATTORNEYS FOR DEFENDANTS
SOUTHERN FOODS GROUP, L.P.
AND SUIZA FOODS CORPORATION
(NOW DEAN FOODS COMPANY)**

## **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................ii

STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT ...............................1

    A.    Specific Issues.......................................................................................1

    B.    Standard of Review Applicable to All Specific Issues ...........................2

SUMMARY OF ARGUMENT .......................................................................................3

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING.........................4

STATEMENT OF MATERIAL FACTS ...........................................................................4

    A.    Dairy Industry in the Valley ..................................................................4

    B.    The November 30, 1999 Southern Foods-F Street Agreements..........6

    C.    The Suiza (now Dean) Acquisition of Southern Foods........................11

ARGUMENT .............................................................................................................12

    A.    As a Matter of Law,  F Street Cannot Establish the Requisite Elements
          of its Antitrust Claims .........................................................................12

    B.    F Street's Contract Claims Must be Dismissed as Matter of Law.......18

    C.    F Street's Conversion Claim Must be Dismissed as Matter of Law....22

    D.    F Street's Attorneys' Fees Claim Must be Dismissed as Matter of Law.............25

    E.    F Street's Exemplary Damages Claim Must be Dismissed as a Matter of Law..25

CONCLUSION..........................................................................................................25

APPENDIX OF SUMMARY JUDGMENT EVIDENCE

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

## FEDERAL CASES

Anderson v. Liberty Lobby, Inc.,
       477 U.S. 242 (1986)..................................................................................2

Brooke Group Ltd. v. Williamson Tobacco Corp.,
       509 U.S. 209 (1993)...........................................................1, 13, 16, 17

C.A.T Indus. Disposal, Inc. v. Browning-Ferris Indus., Inc.,
       884 F.2d 209 (5th Cir. 1989)................................................................17

Celotex Corp. v. Catrett,
       477 U.S. 317 (1986)..................................................................................2

Ramsey v. Henderson,
       286 F.3d 264 (5th Cir. 2002)................................................................15

Stearns Airport Equip. Co. v. FMC Corp.,
       170 F.3d at 518 (5th Cir. 1999)...........................................13, 14, 15, 16

Taylor Publ'g v. Jostens,
       216 F.3d 465 (5th Cir. 2000).........................................................13, 14

Washington v. Armstrong World Indus., Inc.,
       839 F.2d 1121 (5th Cir. 1988)................................................................2

## STATE CASES

Caller-Times Publ'g Co. v. Triad Communications, Inc.,
       826 S.W.2d 576 (Tex. 1992)...............................................1, 13, 14, 16

City of Wichita Falls v. ITT Commercial Fin. Corp.,
       827 S.W.2d 6 (Tex. App.-Fort Worth), *rev'd in part on other grounds*
       835 S.W.2d 65 (Tex. 1992).........................................................23, 24

Green Int'l v. Solis,
       951 S.W.2d 384 (Tex. 1997)....................................................2, 23, 25

Havins v. First Nat'l Bank,
       919 S.W.2d 177 (Tex. App.-Amarillo 1996, no writ)...........................20

Presley v. Cooper,
       284 S.W.2d 138 (Tex. 1955)................................................................24

Southwell v. University of the Incarnate Word,
    974 S.W.2d 351 (Tex. App.-San Antonio 1998, pet. denied) ..............................22

Thompson v. Prince,
    126 S.W.2d 574 (Tex. Civ. App.-Waco 1939, writ ref'd).......................................18

United Mobile Networks, L.P. v. Deaton,
    939 S.W.2d 146 (Tex. 1997) .................................................................... 23, 24

Waisath v. Lack's Stores, Inc.,
    474 S.W.2d 444 (Tex. 1971) ...............................................................................23

## DOCKETED CASES

Gonzalez v. Hygeia Dairy Company,
    Cause No. 2000-04-1699-D .................................................................................8

Moreno v. Hygeia Dairy Company, et al.,
    Cause No. C-2608-99-D .....................................................................................8

## STATUTES AND RULES

15 U.S.C. § 1  .......................................................................................................12

15 U.S.C. § 2  .......................................................................................................12

Fed. R. Civ. P. 56 ................................................................................................1, 2

Sherman Act, 15 U.S.C. §1 et seq.  ......................................................................12

Tex. Bus & Comm. Code § 15.05(b.)......................................................................12

## OTHER

Antitrust Law Developments 5th, at 267 (American Bar Ass'n 2002)............................15

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Court's Scheduling Order, Defendants Southern Foods Group, L.P. ("Southern Foods") and Suiza Foods Corporation, now Dean Foods Company ("Dean"), file this Motion for Summary Judgment and Brief in Support. For the reasons stated below, this motion should be granted, and Plaintiff F Street Investments, Inc.'s ("F Street")[1] claims should be dismissed with prejudice.

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

The central issue to be decided by the Court is whether each of Plaintiff's claims should be dismissed with prejudice pursuant to Fed. R. Civ. P. 56. The issues related to each claim are outlined briefly below. The standard of review applicable to the Court's decision with respect to each of Plaintiff's claims is the same.

## A.    Specific Issues

1.    Whether Defendants are entitled to summary judgment on F Street's predatory pricing claims under the Sherman Act and the Texas Free Enterprise and Antitrust Act? Yes, because Southern Foods priced above both its average variable cost and cost of production. Additionally, there is no dangerous probability of Southern Foods' recouping its investment in any alleged below-cost prices, nor would any such predatory pricing be economically feasible. See Brooke Group Ltd. v. Williamson Tobacco Corp., 509 U.S. 209 (1993); Caller-Times Publ'g Co. v. Triad Communications, Inc., 826 S.W.2d 576, 588 (Tex. 1992). Moreover, Dean is not a "third party beneficiary" of any predatory pricing.

2.    Whether Defendants are entitled to summary judgment for the breach of contract claims related to the Escrow Agreement, Asset Purchase Agreement, and alleged Reimbursement Agreement? Yes, because Southern Foods acted in accordance with the terms of the Asset Purchase Agreement and Escrow Agreement. Moreover, there is no competent summary judgment evidence that a Reimbursement Agreement as alleged by F Street existed.

3.    Whether Defendants are entitled to summary judgment of F Street's conversion

---

[1] F Street's predecessor was the Hygeia Dairy Company ("Hygeia.") Southern Foods acquired the assets of Hygeia effective as of November 30, 1999. Because the name "Hygeia Dairy Company" was part of the acquisition, Plaintiff thereafter began using the name "F Street Investments, Inc." In this motion, the term "F Street" refers to both F Street Investments, Inc. and its predecessor Hygeia.

claims?  Yes, because Southern Foods did not exercise dominion or control over F Street's accounts receivable in a manner inconsistent with F Street's rights; F Street did not own, possess or have an immediate right to possession of the escrowed funds; Southern Foods has not refused to return any allegedly converted property; and F Street has suffered no injury with respect to the ice cream dollies allegedly converted.  See, e.g., Green Int'l v. Solis, 951 S.W.2d 384, 391 (Tex. 1997).

4.     Whether Southern Foods is entitled to summary judgment on the claims for attorneys' fees and exemplary damages?  Yes, because those claims are dependent upon underlying causes of action which are themselves subject to summary judgment.

## B.     Standard of Review Applicable to All Specific Issues

Summary judgment is proper if the pleadings and evidence on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When a motion for summary judgment demonstrates the absence of evidence as to a material fact on which the nonmovant will bear the burden of proof at trial, the nonmovant must come forward with evidence to create a genuine issue of material fact on that point.  Id.; Washington v. Armstrong World Indus., Inc., 839 F.2d 1121, 1122 (5th Cir. 1988) (per curiam).  A party cannot rely upon self-serving conclusions, unsupported by specific facts in the record.  Celotex, 477 U.S. at 322-23.  The non-movant party must point to concrete evidence in the record which supports each essential element of his case.  Id. The nonmovant must do more than point to "some metaphysical doubt as to the material facts," but must instead produce evidence that would be sufficient to enable it to survive a motion for directed verdict at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-52 (1986).  If the non-movant fails to provide the requisite evidence, then it is not entitled to a trial, and the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(e.)

## SUMMARY OF ARGUMENT

Blaming Defendants for its own failed business efforts and the nationwide trend of consolidation in the dairy industry, F Street, a former producer and distributor of dairy products in the Valley area of South Texas, sued Defendants on November 20, 2001. F Street claims that Defendants violated federal and state antitrust laws, and state contract and tort laws. The allegations arise from the vigorous competition in the South Texas dairy industry, the historical financial losses of F Street and the multi-year efforts of its owners to sell. These efforts ultimately resulted in the acquisition of F Street's assets by Southern Foods.

Despite ample opportunity for discovery of substantive facts to support its conclusory allegations, there is no genuine issue of material fact with respect to F Street's claims, all of which should be dismissed as a matter of law. First, Southern Foods did <u>not</u> price its dairy products below average variable or average total cost, a requisite element of predatory pricing claim. Further, it is abundantly clear that due to the vigorous competition in the South Texas dairy industry, Southern Foods did not have a dangerous probability of recouping its investment in any alleged below-cost prices, and thus a predatory pricing scheme was and is <u>not</u> economically feasible as a matter of law. There is no legal basis for the imposition of liability against Dean as a "knowing and intended beneficiary" of Southern Foods' alleged unfair competition, nor is there any evidence to support this infirm theory. Moreover, there is no evidence that Southern Foods breached either the Asset Purchase Agreement or the related Escrow Agreement. Dean was not a party to these Agreements. F Street has no competent evidence that Defendants converted any of F Street's property. Finally, as F Street's claims for attorneys' fees and exemplary damages are dependent upon other claims

that are the proper subject of summary judgment, these claims are also subject to summary judgment dismissal.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

F Street alleges that Defendants violated federal and state antitrust laws, violated state tort laws and committed breaches of contract. F Street filed its Original Petition[2] in state court in Cameron County, Texas. Defendants were served on December 3, 2001 and answered on December 28, 2001. On January 3, 2002, Defendants timely removed the case to this Court on the basis of federal question jurisdiction. Formal discovery in this matter has been ongoing since April 11, 2002. The parties filed a Joint Discovery/Case Management Plan on April 29, 2002. On May 14, 2002 the Court entered a Scheduling Order which established an initial dispositive motions deadline of September 10, 2002. Trial is set for August 4, 2003.

## STATEMENT OF MATERIAL FACTS

### A.   Dairy Industry in the Valley

Southern Foods owns dairy processing plants. These plants receive raw milk in tanker trucks from dairy farmers through the Dairy Farmers of America Co-op. This milk is pasteurized, homogenized and packaged as fluid milk. It is transported by Southern Foods for distribution to customers such as grocery stores, mass merchandisers, restaurants, hotels and schools.[3]

Southern Foods serves the South Texas Valley area from its plant in San Antonio. F Street, headquartered in Harlingen, was formerly a producer and distributor

---

[2]Plaintiff's Original Petition is abbreviated in this motion as the "Pet." Plaintiff filed an Unopposed Motion for Leave to File First Amended Complaint with this Court on August 20, 2002. The First Amended Complaint does not change any of F Street's asserted causes of action. Therefore, this Motion for Summary Judgment will apply equally to the First Amended Complaint if leave to amend is granted.
[3]Aff. of Michael A. Bell (Ex. A) at 2-3 , ¶¶ 3-7.

of dairy products. (Pet. ¶ 6.) Southern Foods and F Street competed in South Texas, in the area commonly described as the "Valley."[4]   Southern Foods introduced its Oak Farms dairy products in the Valley when it began to distribute its products to 7-11 convenience stores located in the Valley.[5]   In the early 1990's, Albertson's and Wal-Mart opened stores in the Valley and both sold Oak Farms dairy products.[6]

H.E.B and Borden Dairy are dairy producers and distributors which compete with Southern Foods in the Valley.[7]   H.E.B is a grocery store chain with stores located throughout the Valley.  H.E.B has its own dairy plant that it uses to service its grocery stores with its own brand of dairy products[8], and it is the dominant dairy producer in the region.[9]  Prior to November 30, 1999, H.E.B held approximately 45% market share and after this date held approximately 45% market share.[10]  Borden Dairy entered the Valley well before Southern Foods' Oak Farms product entry into the region and presently competes for business in the Valley.[11]  Prior to November 30, 1999, Borden Dairy held approximately 18% market share and after this date has held approximately 23% market share.[12]

The goal of Southern Foods' San Antonio facility is to be profitable; accordingly, its products are priced at or above cost of production.[13]   The facility has been successful in operating at a profit.  In 1999, for example, it had a profit of 6.56% of sales.[14]  In 1997,

---

[4]F Street agrees.  See Pet. ¶ 6; see also Pl's. Objs and Ans. to Southern Foods First Set of Interrogs, (Ex. B1) at 4.
[5]Aff. of Scott McClarren (Ex. C) at 3, ¶ 8.
[6]Id.
[7]Bell Aff. (Ex. A) at 3, ¶ 9; McClarren Aff. (Ex. C) at 2-3, ¶¶ 6-7; Aff. of Jimmy Wallace (Ex. D) at 2, ¶ 3.
[8]McClarren Aff. (Ex. C) at 2, ¶ 6.
[9]Id; Bell Aff. (Ex. A) at 3-4, ¶ 9.
[10]Wallace Aff. (Ex. D) at 3-4, ¶ 7.
[11]Bell Aff. (Ex. A) at 4, ¶ 10.
[12]Wallace Aff. (Ex. D) at 3-4, ¶ 7.
[13]Aff. of Wallace Norwood (Ex. E) at 2-3, ¶ 7.
[14]Norwood Aff. (Ex. E) at 3, ¶ 7.

Southern Foods opened an Oak Farms-McAllen branch from which it distributes dairy products in the Valley.[15]  The goal of this branch is to be profitable and it has been successful in this endeavor; in 1999 it operated with a profit margin of approximately 6% of sales.[16]

For a long period of time in the 1990's, F Street was not profitable.[17]  F Street began seeking a purchaser as early as 1993.  (Pet. ¶ 7.) In November 1994, Southern Foods initially offered F Street $9 million for its milk and ice cream business from Victoria south, but the offer was reduced to $4.5 million when the Mexican peso collapsed in December 1994.  (Id.)   F Street rejected the offer.  In the following year, F Street continued to lose money, and, as a consequence, in December 1998, its outside auditors reported their intention to include a "going concern" qualification in F Street's financial statements.  (Id. ¶ 10.) Thereafter, F Street recommenced its previous efforts to find a buyer.  (Id. )

**B.    The November 30, 1999 Southern Foods-F Street Agreements**

On November 30, 1999, Southern Foods acquired almost all of the operating assets of F Street for $9,113,000.  An Asset Purchase Agreement[18] and a related Escrow Agreement[19] (collectively, the "Agreements") memorialized the acquisition.  The Agreements cover a wide range of topics and define the contractual rights of the parties.

As required by Article IV of the Asset Purchase Agreement, $1,000,000 of the purchase price was delivered to an escrow agent to be held and distributed in

---

[15]Wallace Aff. (Ex. D) at 1, ¶ 1.
[16]Wallace Aff. (Ex. D) at 4, ¶ 8.
[17]McClarren Aff. (Ex. C) at 2, ¶ 5.
[18]See Asset Purchase Agreement (Ex. F1).
[19]See Escrow Agreement (Ex. F2).

accordance with the Escrow Agreement.  The purpose of the Escrow was to protect Southern Foods from unknown claims related to F Street and to satisfy any indemnity claims and inventory claims as those terms are defined in the Asset Purchase Agreement.[20]

Paragraph 3(a) of the Escrow Agreement states:

> Five Hundred Thousand Dollars ($500,000) of the Escrow Money can be used (i) to satisfy Indemnity Claims pursuant to Article XI of the Asset Purchase Agreement and (ii) to satisfy any deficiency payments owed by F Street to Southern Foods pursuant to Section 4.2 of the Asset Purchase Agreement relating to the value of F Street's inventory (an 'Inventory Claim') and Five Hundred Thousand Dollars ($500,000) of the Escrow Money can be used (A) to satisfy any environmental remediation costs and expenses pursuant to Section 8.3 of the Asset Purchase Agreement which is estimated as a result of the environmental testing performed by Southern Foods pursuant to the Asset Purchase Agreement that Southern Foods will be required to incur in connection with real property purchased from F Street pursuant to the Asset Purchase Agreement ('Environmental Claims') and (B) to satisfy Inventory Claims.[21]

Paragraph 3(d) of the Escrow Agreement states:

> Five Hundred Thousand Dollars ($500,000.00) of the Escrow Money will be held by Escrow Agent for a period of 120 calendar days from the date of this Agreement and will be available to satisfy Indemnity Claims and Inventory Claims. Upon the expiration of such 120 calendar day period, the Escrow Agent will distribute to F Street the sum of Four Hundred Thousand Dollars ($400,000.00) less the amount of any Indemnity Claims or Inventory Claims that have been received by Escrow Agent.[22]

As to the remaining $100,000, the parties agreed as follows:

> …the Escrow Money will continue to be held by Escrow Agent to satisfy Indemnity Claims until the first anniversary of the date of this Agreement, at which time Escrow Agent will distribute the balance of the Escrow Money to F Street less the amount of any Indemnity Claims that have been received by Escrow Agent.[23]

---

[20]Tollison Aff. (Ex. F) at 2-3, ¶ 2.
[21]Escrow Agreement (Ex. F2) at 2.
[22]Id. at 3.
[23]Id.

Southern Foods asserted the following Indemnity Claims:

| | |
|---|---|
| November 1999 Payroll | $ 67,163.62 |
| Tyra Auto Repair | $ 928.41 |
| McKinney Waste Management | $ 426.00 |
| Texaco | $ 156.64 |
| Mayflower Transit | $ 2,726.20 |
| PC with Chronos Timeclock Software | $ 7,000.00 |
| C-D Electric | $ 660.00 |
| Dealers Electric Supply | $ 6,733.79 |
| Raymond Leasing | $ 2,413.80 |
| Telephone Charges | $ 5,298.24 |
| | $93,506.70[24] |

F Street acknowledges that Southern Foods has indemnity claims under the Escrow Agreement of at least $70,327.42. (Pet. ¶ 20.)

Southern Foods also has a claim for indemnification from two employment related lawsuits: *Gonzalez v. Hygeia Dairy Company*, Cause No. 2000-04-1699-D, which was pending in the 103rd Judicial District Court in Hidalgo, Texas; and *Moreno v. Hygeia Dairy Company, et al.,* Cause No. M-00-160, in the United States District Court for the Southern District of Texas, McAllen Division.[25] F Street has not challenged Southern Foods' right to indemnity for the defense of these claims. (Pet. ¶ 20.) As of July 18, 2002, Southern Foods has incurred fees and expenses in the amount of $14,629.99 in *Moreno* and $11,519.15 in *Gonzalez*. The *Moreno* claim is still pending; thus, the amounts spent in defense and subject to indemnity by F Street may increase.[26]

With respect to the indemnity claims, on numerous occasions–both before and

---

[24]Tollison Aff. (Ex. F) at 2, ¶ 4.  Originally, Southern Foods also asserted an indemnity claim relating to Hatteras Packaging Systems in the amount of $71,840.31.  However, the parties subsequently agreed that this claim was rendered moot when a court dismissed Hatteras' writ of garnishment action.
[25]Aff. of Alex Madrazo (Ex. G) at 2, ¶¶ 2-3.
[26]Id. at 3, ¶ 4.

after F Street filed this lawsuit—Southern Foods has requested that the escrowed money be distributed to the parties. Indeed, as recently as May 2002, Southern Foods proposed to F Street that over $355,000 be disbursed to F Street from the escrow account, with approximately $96,000 disbursed to Southern Foods.[27]  Remarkably and despite its pending bankruptcy and professions of financial distress, F Street has refused to take action to enable it to obtain over $355,000.  Instead, F Street continues to demand this Court's time and resources to resolve a dispute which could and should have been resolved, at least partially if not wholly, by the parties.

F Street has also alleged claims relating to the collection of accounts receivable. Pursuant to Paragraph 12.14 of the Asset Purchase Agreement, Southern Foods agreed "to attempt to collect the Accounts Receivable on behalf of [F Street] on a commercially reasonable basis and forward the proceeds of its collection effort to [F Street] within five business days following receipt by [Southern Foods]."[28]  In addition, "[a]ny Accounts Receivable that remain uncollected as of one hundred twenty (120) days following [November 30, 1999], shall become the sole responsibility of F Street and Southern Foods shall have no obligation to take any further action with respect to such Accounts Receivable."[29]  That provision obligated Southern Foods to attempt to collect receivables.  It was no guarantee that a certain amount would be collected.

To collect these accounts receivable, Southern Foods employed essentially the same methods used by F Street sales representatives responsible for collection of the account receivables.[30]  The sales representatives in F Street's former sales area were

---

[27] See (Ex. B2) at 4.
[28] Asset Purchase Agreement (Ex. F1) at 35.
[29] Id.
[30] McClarren Aff. (Ex. C) at 4, ¶ 12.

instructed to continue to attempt to collect F Street's old accounts.[31] As was standard collection practice, the sales representatives placed phone calls and made personal visits to those behind in payment.[32]

Southern Foods also instituted a system to accurately account and distribute money it received as payment for F Street's accounts. Until February 2000, Southern Foods continued to use F Street's computer system to record and post checks received on behalf of F Street.[33] Thereafter, Southern Foods instituted a system whereby checks received on behalf of F Street were separated from checks received for Southern Foods' Oak Farm accounts, all documentation was copied, and the money was placed in a general ledger account until it was transferred to F Street.[34] The collection efforts and accounting systems were effective. Southern Foods collected and paid $4,603,255.90 to F Street for account receivables.[35]

A component of its accounts receivable claims against Southern Foods is F Street's allegation concerning the handling of the account of former F Street customer, Mario Castro. (Pet. ¶ 15.) Castro is a wholesale milk distributor doing business as "Castro School Milk." After Southern Foods acquired F Street, Castro purchased milk from Southern Foods.[36] Aware that Castro had an outstanding receivable to F Street, Southern Foods attempted to secure a payment arrangement and to resolve a dispute as to the amount owed. Following this attempt, Southern Foods provided Castro's phone number to a former F Street officer.[37] Southern Foods was specifically instructed

---

[31]Id.
[32]Id.
[33]Norwood Aff. (Ex. E) at 3, ¶ 8.
[34]Id.
[35]Id.
[36]Id.
[37]Id. at 4, ¶ 9.

that F Street would handle the collection of Castro's account receivable.[38]

F Street also bases its claims on Southern Foods' alleged failures to collect F Street's retail accounts receivable. F Street operated retail milk delivery routes to individuals who used the WIC[39] card or the Lone Star card as payment.[40]  These retail milk delivery routes were part of the acquired assets. The Texas Department of Health requested Southern Foods, by letter dated December 6, 1999, to cease and desist these delivery routes or potentially face fines.[41]  The Texas Department of Health further advised Southern Foods on December 7, 1999 that effective December 8, 1999 the F Street retail accounts receivable could no longer be paid for with the WIC card or the Lone Star card.[42]  Further, the State told Southern Foods that if any product was sold or account collected on these cards after December 7, 1999, the State would not reimburse the purchases or payments.[43]  Moreover, the Health Department also warned Southern Foods that it would be subject to fines if it accepted the Lone Star card for dairy product purchases. Based upon this advice, Southern Foods determined the retail milk delivery business would not be profitable and ceased that business.[44]  Nevertheless, Southern Foods' retail delivery drivers continued their collection efforts on F Street's accounts even after this portion of the business ceased operations.[45]

## C.     The Suiza (now Dean) Acquisition of Southern Foods

On December 31, 1999, Suiza (now Dean) acquired Southern Foods.  Southern

---

[38]Id.
[39]"WIC" is the common acronym for the Women, Infants & Children program, a federal program targeting low-income women, infants and children who are nutritionally at risk.  See www.fns.usda.gov/wic.
[40]Id. at 4, ¶ 10.
[41]See (Ex. E1); Norwood Aff. (Ex. E) at 4, ¶ 10.
[42]Norwood Aff.(Ex. E) at 4, ¶ 10.
[43]Id.
[44]Id.
[45]Wallace Aff. (Ex. D) at 5, ¶ 10.

Foods continues to produce and distribute its Oak Farms dairy products throughout Texas.  Dean did not produce or distribute dairy products in the Valley at any time relevant to this lawsuit.  It was not involved in any pricing decisions related to dairy products sold by Southern Foods in the Valley.[46]

The Dean acquisition of Southern Foods occurred after the effective date of the Asset Purchase Agreement and related Escrow Agreement between Southern Foods and F Street.  Dean is not a party to either the Asset Purchase Agreement or Escrow Agreement.[47]  Dean assumes no obligations under the terms of the Agreements nor does it directly receive any of the benefits of the Agreements.  Accordingly, to the extent F Streets attempts to "lump" the Defendants together with its loose allegations and claims (E.g., Pet. ¶¶ 29, 30, 32, etc.), those efforts should be rejected.

## ARGUMENT

### A.    As a Matter of Law,  F Street Cannot Establish the Requisite Elements of its Antitrust Claims

Mischaracterizing lawful competition by Defendants as "predatory pricing," F Street asserts claims under the Sherman Act and the Texas Free Enterprise & Antitrust Act ("TFEAA"). [48]  In particular, F Street alleges that Southern Foods "lowered prices based on an objectively reasonable expectation of recouping its losses by later charging higher prices, that in doing so Southern's prices fell below its average variable cost, that

---

[46]Bell Aff. (Ex. A) at 5, ¶ 12.

[47]See Asset Purchase Agreement (Ex. F1) at 1; Escrow Agreement (Ex. F2) at 1.

[48]Although F Street identifies its federal antitrust claim as being brought under the Sherman Act "15 U.S.C. §1 et seq.," predatory pricing is actually generally treated as a form of monopolization, which is governed by 15 U.S.C. § 2.  Moreover, F Street does not plead the elements of conspiracy in restraint of trade under 15 U.S.C. § 1. Section 2 of the Sherman Act states that "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. . . ." 15 U.S.C. § 2. The TFEAA makes it "unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." Tex. Bus. & Comm. Code § 15.05(b.)

Southern prices fell below its short-run profit-maximizing price and average total cost, and that Southern's benefit from the price-drops stemmed primarily from the price-drops' tendency to discipline and eliminate competition, particularly Hygeia, thereby enhancing Defendants' long-term ability to reap the benefits of monopoly power after it completed its contemplated purchase of Hygeia at a forced-sale price." (Pet. ¶ 9.)

As the Supreme Court observed, "predatory pricing schemes are rarely tried, and even more rarely successful." Brooke Group Ltd. v. Williamson Tobacco Corp., 509 U.S. 209, 226 (1993) (internal quotations omitted). Indeed, the Supreme Court has "expressed extreme skepticism of predatory pricing claims," and the Fifth Circuit held that "the standard for inferring an impermissible predatory pricing scheme is high." Taylor Publ'g v. Jostens, 216 F.3d 465, 477-78 (5th Cir. 2000) (quoting Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 527-28 (5th Cir. 1999)).

To establish a claim of predatory pricing, F Street must prove: (1) that the prices complained of are below an appropriate measure of its rival's [Southern Foods'] costs; and (2) that its competitor [Southern Foods] had a dangerous probability of recouping its investment in below-cost prices. Brooke Group, 509 U.S. at 222-24. Similarly, the elements of a predatory pricing claim under Texas law are: (1) the seller has an objectively reasonable expectation of recouping its losses due to alleged predatory pricing by charging higher prices later, that is, predatory pricing is economically feasible; and (2)(a) the price charged is below average variable costs; or (b)(i) there are substantial barriers to market entry; and (ii) seller is charging price below its short-run profit-maximizing price and its average total cost; and (iii) benefits of seller's price depended on its tendency to discipline or eliminate competition and thereby enhance firm's long-term ability to reap benefits of monopoly power. Caller-Times Publ'g. Co. v.

Triad Communications, Inc., 826 S.W.2d 576, 588 (Tex. 1992).

As to the appropriate measure of cost, the Fifth Circuit has held that "a plaintiff must show pricing below the standard this Court has long embraced as an appropriate measure of cost- average variable cost." Stearns, 170 F.3d at 532. Average variable cost is; the costs that vary with the changes in output divided by the output. Taylor Publ'g, 216 F.3d at 478 n.6; see also Caller-Times, 826 S.W.2d at 583.

The primary cost associated with the production of dairy products is the cost of raw milk.[49] Other significant production costs include labor costs, transport costs, costs for additional ingredients in certain products, and equipment maintenance costs.[50] Southern Foods' dairy products are priced above the costs of production and never priced below the costs of production.[51] After pricing based on production costs, competitive forces in the market are the next factor in determining price.[52]

As an alternative to establishing pricing below average variable costs, and only in an industry where there are substantial barriers to market entry, a party alleging predatory pricing may attempt to prove pricing below the seller's short-run profit-maximizing price and its average total cost where the benefits of seller's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap benefits of monopoly power. Southern Foods priced the dairy products sold in the Valley above costs of production.[53] Further, as described more fully below, the market conditions and competition in the Valley for dairy products prevent

---

[49]Bell Aff. (Ex. A) at 3, ¶ 7; Norwood Aff. (Ex. E) at 2, ¶ 4 .
[50]Id.
[51]Bell Aff. (Ex. A) at 3, ¶ 7; Norwood Aff. (Ex. E) at 3, ¶ 7.
[52]Norwood Aff. (Ex. E) at 2, ¶ 6.
[53]Bell Aff. (Ex. A) at 3, ¶ 7; Norwood Aff. (Ex. E) at 3, ¶ 7.

the long-term ability to reap the benefits of monopoly power even assuming such power could be achieved in the market.

F Street has provided no evidence regarding Southern Foods' variable costs, fixed costs, or profits derived from its sale of dairy products in the Valley.  F Street's allegations are based only on its subjective beliefs. (See e.g. Pet. ¶¶ 8-9, 22-27.) Indeed, consistent with its conclusory pleadings, F Street responded to pointed interrogatories with only more conclusions and no facts.  F Street contends that Southern Foods sold its products "at substantially reduced price levels or at large volume pricing levels regardless of the size of the customer."[54] Conclusory allegations such as these are not enough to survive summary judgment.  Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).

In sum, where a predatory pricing scheme is alleged, judgment as a matter of law is appropriate when a plaintiff fails to adequately specify how the challenged pricing undercuts the defendant's variable costs. Stearns, 170 F.3d at 532.  F Street has not and cannot provide such factual specificity.  Accordingly, there is no genuine issue of material fact with respect to the pricing of the dairy products, and F Street's antitrust claims should be dismissed.

Summary judgment of antitrust claims is also appropriate because F Street cannot establish the necessary elements of "recoupment" (under federal law) or "economic feasibility" (under Texas law.) The two prerequisites to establish recoupment under federal law are:  (1) the below-cost pricing must drive the intended target from the market; and (2) the market (considering market shares, ease of entry, excess capacity

---

[54]See Ex. 1 attached to Brumbaugh Aff. (Ex. B) at 4. F Street's complaints about low prices are ironic.  The

and all other relevant factors) must be susceptible to monopoly pricing following the victim's exit. <u>Antitrust Law Developments 5th</u>, 267 (American Bar Ass'n 2002) (citing <u>Brooke Group</u>, 509 U.S. at 226). Unless there is a showing of reasonably possible success using the alleged predatory pricing scheme, there is no predation. <u>Stearns</u>, 170 F.3d at 529. Under Texas law, the test is to determine if the predatory pricing is economically feasible. <u>Caller-Times</u>, 826 S.W.2d at 588. It is only economically feasible when a company has an objectively reasonable expectation of recouping its losses from predatory pricing by charging higher prices later. <u>Id.</u> at 581. Unless predatory pricing is economically plausible, a business has no motive to engage in the practice. <u>Id.</u> Market structure can make recoupment impossible; such is the case with market structure for dairy products in the Valley. <u>See</u> <u>id.</u>

As established above, the dairy industry in the Valley was highly competitive prior to November 30, 1999 and continues to be highly competitive.[55] H.E.B is the dominant producer in the market, and the largest volume of milk is sold at grocery stores.[56] Borden Dairy has been in the Valley longer than Southern Foods and remains a significant and capable competitor.[57] If Southern Foods priced below cost, then attempted to raise the prices in an effort to recoup losses from the below-cost pricing, consumers could and likely would turn to the H.E.B and Borden Dairy products.[58] Where the market is highly competitive, summary disposition of a predatory pricing claim is appropriate. <u>Brooke Group</u>, 509 U.S. 226.

---

"ultimate goal" of the antitrust laws is low prices (<u>see</u> <u>Caller-Times</u>, 826 S.W.2d at 582); low prices are not an indication of monopoly.

[55]<u>See</u> <u>supra</u> at 5; Bell Aff. (Ex. A) at 4, ¶ 10; McClarren Aff. (Ex. C) at 2, ¶ 6; Wallace Aff. (Ex. D) at 2-4, ¶¶ 4-8.

[56]<u>See</u> <u>supra</u> at 5; Bell Aff. (Ex. A) at 3-4, ¶ 9; McClarren Aff. (Ex. C) at 2, ¶ 6.

[57]Bell Aff. (Ex. A) at 4, ¶ 10 ; McClarren Aff. (Ex. C) at 3, ¶ 7; Wallace Aff. (Ex. D) at 2, ¶ 5.

[58]Bell Aff. (Ex. A) at 4, ¶ 11; Wallace Aff. (Ex. D) at 3, ¶ 6.

Not only does the market structure not support F Street's allegation, but its own pleadings as to its competitors' market share belies the claims that predatory pricing is possible. F Street alleges that Southern Foods' market share at the time of the alleged predatory pricing was only 15%. (Pet. ¶ 8.) F Street had a greater market share than did Southern Foods prior to the acquisition.[59] Summary judgment is properly granted where the plaintiff is unable to show a dangerous probability that defendant would succeed in its alleged monopoly attempt. See C.A.T. Indus. Disposal, Inc. v. Browning-Ferris Indus., Inc., 884 F.2d 209 (5th Cir. 1989) (no showing of dangerous probability of success where defendant had 10% market share of commercial containerized refuse collection business at time of alleged predatory pricing and plaintiff had at least 80% market share.). Absent oligopolistic or coordinated activity by several defendants--a claim not asserted by F Street--15% market share is not enough to impose liability for predatory pricing. See generally Brooke Group, 509 U.S. at 209 (12% market share insufficient.) Based upon the market share held by Southern Foods and the realities of the competition in the Valley, there is no genuine issue of material fact regarding the elements of recoupment and economic feasibility. Indeed, the evidence is clear and to the contrary: Southern Foods could not later recoup the money lost by alleged below-cost pricing.

F Street also attempts to implicate Dean in the alleged predatory pricing scheme by asserting that Dean was the "knowing and intentional beneficiary of such acts." (Pet. ¶¶ 9, 22.) It is undisputed that Dean acquired Southern Foods after Southern Foods' acquired F Street. The "knowing and intended" beneficiary claim is nonsensical given

---

[59]Wallace Aff. (Ex. D) at 3, ¶ 7.

Dean did not operate in the Valley at the time of the alleged predatory pricing,[60] and also considering the competition in the Valley both before and after Dean acquired Southern Foods.  In sum, there is no competent evidence on any of the elements essential for a predatory pricing claim, and therefore, summary judgment is appropriate.

## B.    F Street's Contract Claims Must be Dismissed as Matter of Law

The Escrow Agreement Claim.  Each party agrees that the other is due certain funds from the Escrow Agreement.  F Street acknowledges Southern Foods' indemnity claims under the Escrow Agreement in an amount of at least $70,327.42. (Pet. ¶20.) Southern Foods has repeatedly, both prior to and since the filing of this lawsuit, attempted to have escrowed money disbursed to F Street and to Southern Foods.  F Street has rebuffed these efforts.[61]  F Street's unjustified refusals to resolve this issue have forced Southern Foods to bring this claim to the Court for resolution.

As described above, Southern Foods and F Street entered into an Escrow Agreement.[62] F Street asserts that Southern Foods failed to release escrowed sums when due pursuant to the terms of the Escrow Agreement. (Pet. ¶ 28.) The purpose of the Escrow Agreement was to protect Southern Foods and to satisfy any indemnity, inventory, or environmental claims as those terms were defined in the Asset Purchase

---

[60]Bell Aff. (Ex. A) at 5, ¶ 12.

[61]To the extent F Street attempts to justify these refusals by a claim of offset against the escrowed funds for the money allegedly owed on accounts receivable, this position is not supportable under Texas law.  To be entitled to an offset for competing claims, the claims themselves must be claims relating to both parties, must have sufficient mutuality, and must be due to the same right or capacity.  Thompson v. Prince, 126 S.W.2d 574, 576 (Tex. Civ. App.-Waco 1939, writ ref'd). Although the Asset Purchase Agreement and the Escrow Agreement may be related, any such relationship does not mean that claims derived from these agreements are from the same legal right or capacity.  The conditions permitting disbursement from the Escrow Agreement are distinct from the "Collection Accounts Receivable" provision of the Asset Purchase Agreement.  Further, the Escrow Agreement imposes specific obligations and duties on the third-party escrow agent, an entity not involved in the accounts receivable claim.

[62]See supra at p. 6-7.

Agreement.[63] Southern Foods asserted several indemnity claims.[64]  The indemnity claims asserted amount to a total of $165,347.01.[65] Southern Foods also seeks indemnity for the defense of two lawsuits that were filed against F Street.  As of July 18, 2002 Southern Foods has incurred fees and expenses in the amount of $14,629.99 for the *Moreno* lawsuit and $11,519.15 for the *Gonzalez* lawsuit for a subtotal of $26,149.14.[66]

F Street acknowledges that Southern Foods has legitimate indemnity claims and acknowledges Southern Foods is entitled to reimbursement for the defense of the *Moreno* and *Gonzalez* lawsuits.  There is no genuine issue of material fact that Southern Foods is owed certain sums pursuant to the Escrow Agreement.  Moreover, Southern Foods has agreed to the disbursement of the funds from the Escrow Agreement, subject to the indemnity claims and subject to any additionally incurred fees and expenses in defense of the lawsuits, but F Street has refused acceptance of this disbursement.

Accordingly, there is no genuine issue of material fact with respect to F Street's breach of contract claim, as Southern Foods has acted in accordance with the terms of the Escrow Agreement.  Further, there is no competent summary judgment evidence that any of Southern Foods' actions constitute breach of the Escrow Agreement.

The Asset Purchase Agreement Accounts Receivable Claim.  F Street contends that Southern Foods failed to collect wholesale accounts receivable on behalf of F

---

[63]Tollison Aff. (Ex. F) at 1-2, ¶ 2.
[64]Id at 2-3, ¶ 4.
[65]Id. However, this amount includes the Hatteras Packaging Systems claim in the amount of $71,840.31 that the parties have agreed is a moot claim.
[66]Madrazo Aff. (Ex. G) at 2, ¶ 2-3; see supra at p. 8.

Street and Mario Castro's accounts receivable on a commercially reasonable basis. (Pet. ¶¶ 30-31.)  As explained above, Southern Foods agreed *"to attempt to collect* the Accounts Receivable on behalf of [F Street] on a commercially reasonable basis."[67] The term "commercially reasonable" is not defined under the Asset Purchase Agreement. Any concept of commercial reasonableness should at least consider the method, manner, time, place and terms of [collection].   See Havins v. First Nat'l Bank, 919 S.W.2d 177, 181 (Tex. App.-Amarillo 1996, no writ) (considering the disposition of collateral in a secured creditor transaction.) The totality of the circumstances particular to the case should be considered in determining if conduct was commercially reasonable. Id.

Southern Foods employed essentially the same collection methods as those previously employed by F Street. Southern Foods sales representatives contacted F Street's delinquent customers.[68]   Moreover, Southern Foods instituted a system to account for and credit any payments received on behalf of F Street.   The collection effort was successful.  Southern Foods collected and paid $4,603,255.90 to F Street as collections of accounts receivable.[69]   There is no genuine issue of material fact that Southern Foods did attempt collect the wholesale accounts on behalf of F Street on a commercially reasonable basis and remitted collected funds to F Street.

Similarly, Southern Foods acted on a commercially reasonable basis to attempt to collect the accounts from Castro.  Southern Foods was aware that Castro had an

---

[67]Asset Purchase Agreement (Ex. F1) at 35, see supra at p. 9.
[68]McClarren Aff. (Ex. C) at 4, ¶ 12; see supra at p. 9-10.
[69]Norwood Aff. (Ex. E) at 3, ¶ 8.

outstanding account receivable to F Street at the time of the acquisition.[70]  Southern

Foods contacted Castro directly to determine the reason for the delinquency in payment

and made an effort to secure a payment arrangement on behalf of F Street.[71]

Thereafter, Southern Foods was specifically instructed that F Street would handle the

collection of this account.[72]  To assist with collection, Southern Foods provided an F

Street officer with Castro's phone number and contact information.[73]  Given F Street's

assurances that it would handle the collection of the past due accounts, it was

commercially reasonable for Southern Foods to continue to sell Castro milk.  The Asset

Purchase Agreement is also clear that any accounts receivable that remain uncollected

as of 120 days after November 30, 1999 became the sole responsibility of F Street, and

Southern Foods had no obligation to take any further action.[74]  There is no genuine

issue of material fact that Southern Foods acted in a commercially reasonable manner,

and F Street's breach of the Asset Purchase Agreement based on the collection of

Castro's account should be dismissed as a matter of law.

F Street further alleges that Southern Foods failed to collect F Street's retail

accounts receivable on a commercially reasonable basis.  (Pet. ¶ 32.)  Southern Foods

did shut down all retail delivery routes effective December 8, 1999. This decision was

preceded by information that the WIC and Lone Star cards, the dominant forms of

payment on these routes, could no longer be accepted.[75] Southern Foods was informed

that if it continued to operate these routes and attempt to accept these forms of

---

[70]Norwood Aff. (Ex. E) at 4, ¶ 9; see supra at 10-11.
[71]Id.
[72]Id.
[73]Norwood Aff. (Ex. E) at 4, ¶ 9; see supra at p. 10.
[74]See supra at p. 9.
[75]Norwood Aff. (Ex. E) at 4, ¶ 10.

payment, it could be subject to fines.[76]   Obviously, the appropriate business decision was to shut down these retail routes.   Nevertheless, even after these routes were eliminated, Southern Foods directed the retail delivery drivers to attempt to collect on the accounts due F Street.[77]   There is no genuine issue of material fact that Southern Foods acted on a commercially reasonable basis with respect to F Street's retail accounts receivable.   Therefore, Southern Foods is entitled to judgment as a matter of law on the breach of contract for retail accounts receivable claim.

The Reimbursement Claim. F Street alleges Defendants orally agreed to repay F Street for expenses incurred during F Street's 1999 Christmas parties and that this alleged agreement was breached. (Pet. ¶ 34.)   Before a party can breach an agreement, there must be a showing that there was a valid enforceable contract between the parties.  Southwell v. University of the Incarnate Word, 974 S.W.2d 351, 354-55 (Tex. App.–San Antonio 1998, pet. denied).  Not only has F Street not made the required showing, but by its own pleadings, F Street does not even know whether the alleged representation was made on behalf of Southern Foods or Suiza.  (Pet. ¶ 17.)

## C.    F Street's Conversion Claim Must be Dismissed as Matter of Law

F Street claims that Southern Foods converted F Street's property by:  (1) failing to pay F Street's accounts receivable; (2) by preventing disbursement of F Street's escrowed funds; and (3) by refusing to return F Street's ice cream dollies. (Pet. ¶ 35.) This claim cannot withstand summary judgment.

The elements of conversion under Texas law are: (1) the plaintiff owned, possessed, or had the right of immediate possession of the property; (2) the property

---

[76]Id.
[77]Wallace Aff. (Ex. D) at 5, ¶ 10.

was personal property; (3) the defendant wrongfully exercised dominion or control over the property; and (4) the plaintiff suffered injury.  See Green Int'l v. Solis, 951 S.W.2d 384, 391 (Tex. 1997); United Mobile Networks, L.P. v. Deaton, 939 S.W.2d 146, 147-48 (Tex. 1997).  To prove conversion based upon the alleged failure to collect accounts receivable, F Street must establish Southern Foods wrongfully exercised dominion and control over F Street's property in a manner inconsistent with F Street's rights.  Waisath v. Lack's Stores, Inc., 474 S.W.2d 444, 447 (Tex. 1971).  Any "control" that Southern Foods had over payments of F Street's old accounts was pursuant to the Asset Purchase Agreement and strictly on behalf of F Street.[78]  Southern Foods employed essentially the same collection methods as those previously used by F Street and used sales representatives to collect these old accounts.[79]  Further, Southern Foods instituted a system to accurately account and distribute the money it received on behalf of F Street's accounts.[80]  Accordingly, there is no genuine issue of material fact because Southern Foods did not wrongfully exercise dominion and control over F Street's accounts receivable in a manner inconsistent with F Street's rights.

F Street did not own, possess or have an immediate right to possession of the funds in the Escrow Agreement, a requisite element of this claim.  A disbursement  must be in accordance with the terms of the Escrow Agreement. F Street had only a future interest in the funds until any indemnity, inventory, or environmental claims were satisfied.  As the acknowledged indemnity claims still have not been disbursed to Southern Foods, F Street only has a future interest in the escrowed funds.  A plaintiff

[78]Asset Purchase Agreement (Ex. F1) at 35; see supra at p. 9.
[79]McClarren Aff. (Ex. C) at 4, ¶ 12; see supra at p. 9.
[80]Norwood Aff. (Ex. E) at 3, ¶ 8; see supra at p. 10.

who has only a future interest in the property cannot sue for conversion. See City of Wichita Falls v. ITT Commercial Fin. Corp., 827 S.W.2d 6, 9-10 (Tex. App.-Fort Worth), rev'd in part on other grounds, 835 S.W.2d 65 (Tex. 1992).

Even assuming Southern Foods acquired F Street's property by virtue of the agreement to place money in escrow, Southern Foods acquired the property legally. Where property is originally acquired legally, to prove a claim for conversion the plaintiff must establish the defendant refused to return the property after the plaintiff demanded its return. Presley v. Cooper, 284 S.W.2d 138, 141 (Tex. 1955). Southern Foods released $500,000 of the escrowed money to F Street and made numerous offers, both before and since the filing of this lawsuit, to authorize the escrow agent to disburse the remaining funds. F Street has refused these offers. Southern Foods has not refused to return any allegedly converted property.

F Street specifically alleges Defendants converted ice cream dollies and that had the dollies been returned they "would have been counted as inventory and increased the sale price." (Pet. ¶ 18.) F Street is wrong. The term "Inventory" is defined in the Asset Purchase Agreement and does not include ice cream dollies.[81] Accordingly, the dollies would not have been a consideration in the $9 million plus sale price. F Street has therefore suffered no injury, a requisite element of a conversion claim. United Mobile Networks, 939 S.W.2d at 147-48. Finally, F Street has presented no evidence that either Southern Foods or Suiza wrongfully exercised dominion or control of the property. As F Street is unable to demonstrate the necessary elements of a conversion claim, the claim is subject to summary judgment.

---

[81]Asset Purchase Agreement (Ex. F1) at 4.

**D.    F Street's Attorneys' Fees Claim Must be Dismissed as Matter of Law**

F Street's cause of action for attorneys' fees (the Seventh Cause of Action) is expressly based on Southern Foods' alleged breaches of contract.  (Pet. ¶ 36.)  As explained above, all of the claims for breach of contract are subject to summary judgment.  Absent the breach of contract claims, there is no legal basis for the Seventh Cause of Action seeking attorneys' fees; thus, that claim should also be dismissed.

**E.    F Street's Exemplary Damages Claim Must be Dismissed as a Matter of Law**

F Street seeks exemplary damages based on Defendants' alleged "intentional acts of conversion."  (Pet. ¶ 37.)  Obviously, a prerequisite to recovery of exemplary damages on a conversion claim is establishing each of the elements of conversion described above.    Additionally, a plaintiff can recover exemplary damages for conversion only if there is also clear and convincing evidence of malice. Green Int'l v. Solis, 951 S.W.2d 384, 391 (Tex. 1997).  For the reasons explained above, F Street has failed to establish the conversion elements, and there is no evidence of malice, much less clear and convincing evidence.  There is no claim on which exemplary damages may be recovered; therefore, the exemplary damages claim must be dismissed.

**CONCLUSION**

For the reasons stated above, Defendants request that the Court grant this motion for summary judgment in its entirety, dismiss F Street's Original Petition with prejudice, and enter a final, take-nothing judgment in favor of Defendants.

DATED: September 10, 2002.

Respectfully submitted,

JERRY L. BEANE
Attorney-in-Charge
State Bar No. 01966000
Southern Dist. Bar No. 8993
KAY LYNN BRUMBAUGH
State Bar No. 00785152
Southern Dist. Bar No. 21341
STRASBURGER & PRICE, L.L.P.
901 Main Street, Suite 4300
Dallas, Texas 75202
(214) 651-4300
(214) 651-4330 (Telecopier)

AND

EDUARDO R. RODRIGUEZ
State Bar No. 17144000
Southern Dist. Bar No. 1944
ALISON KENNAMER
State Bar No. 112804000
Southern Dist. Bar No. 12023
RODRIGUEZ, COLVIN & CHANEY
1201 East Van Buren
Brownsville, Texas 78522
(956) 542-7441
(956) 541-2170 (Telecopier)

**ATTORNEYS FOR DEFENDANTS**
**SOUTHERN FOODS GROUP, L.P.**
**AND SUIZA FOODS CORPORATION**
**(NOW DEAN FOODS COMPANY)**

## CERTIFICATE OF CONFERENCE

I, Kay Lynn Brumbaugh, certify that on September 9, 2002, I conferred with Plaintiff's counsel Peter Holzer regarding the relief sought in this motion. Plaintiff is opposed to the relief sought; therefore, this motion is presented to the Court for determination.

_____

KAY LYNN BRUMBAUGH

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been forwarded to all counsel of record on this the 10th day of September, 2002 via U.S. Mail, and that the motion and brief have also been forwarded to plaintiff's counsel via electronic mail per the agreement of counsel.

_____

KAY LYNN BRUMBAUGH

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

F STREET INVESTMENTS, INC.          §
A TEXAS CORPORATION F/K/A           §
HYGEIA DAIRY COMPANY                §
                                    §
v.                                  §          CIVIL ACTION B-02-001
                                    §
SOUTHERN FOODS GROUP, L.P. AND      §
SUIZA FOODS CORPORATION             §

**DEFENDANTS' APPENDIX OF SUMMARY JUDGMENT EVIDENCE**

| Exhibit | Description |
|---------|-------------|
| A | Affidavit of Michael A. Bell |
| B | Affidavit of Kay Lynn Brumbaugh |
| B1 | Plaintiff's Objections and Answers to Southern Foods First Set of Interrogatories |
| B2 | May 10, 2002 letter from counsel for defendants to Mr. Peter Holzer, counsel for Plaintiff F Street Investments |
| C | Affidavit of Scott McClarren |
| D | Affidavit of Jimmy Wallace |
| E | Affidavit of Wallace Norwood |
| E1 | December 6, 1999 letter from the Texas Department of Health to Southern Foods |
| F | Affidavit of Eddie Tollison |
| F1 | November 30, 1999 Asset Purchase Agreement |
| F2 | November 30, 1999 Escrow Agreement |
| G | Affidavit of Alex Madrazo |

760427.1 /SP2/75935/0208/090902