

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 3 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| F STREET INVESTMENTS, INC. | § | |
| A TEXAS CORPORATION F/K/A | § | |
| HYGEIA DAIRY COMPANY | § | |
| | § | |
| v. | § | CIVIL    ACTION    B-02001 |
| | § | |
| SOUTHERN FOODS GROUP, L.P. AND | § | |
| SUIZA FOODS CORPORATION | § | |

## DEFENDANTS' RESPONSE AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CONDITIONAL MOTION FOR SEVERANCE

Respectfully submitted,

JERRY L. BEANE
Attorney-in-Charge
State Bar No. 01966000
Southern Dist. Bar No. 8993
KAY LYNN BRUMBAUGH
State Bar No. 00785152
Southern Dist. Bar No. 21341
STRASBURGER & PRICE, L.L.P.
901 Main Street, Suite 4300
Dallas, Texas 75202
(214) 651-4300
(214) 651-4330 (Telecopier)

AND

EDUARDO R. RODRIGUEZ
State Bar No. 17144000
Southern Dist. Bar No. 1944
ALISON KENNAMER
State Bar No. 112804000
Southern Dist. Bar No. 12023
RODRIGUEZ, COLVIN & CHANEY
1201 East Van Buren
Brownsville, Texas 78522
(956) 542-7441
(956) 541-2170 (Telecopier)

**ATTORNEYS FOR DEFENDANTS
SOUTHERN FOODS GROUP, L.P.
AND SUIZA FOODS CORPORATION
(NOW DEAN FOODS COMPANY)**

## TABLE OF CONTENTS

STATEMENT OF ISSUES TO RULED UPON BY THE COURT ............................................ 1

    A.    Specific Issues ............................................................................................... 1
    B.    Standard of Review Applicable to All Specific Issues ................................... 3

SUMMARY OF ARGUMENT ............................................................................................ 3

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ................................ 4

FACTUAL BACKGROUND ............................................................................................... 4

ARGUMENT ................................................................................................................... 10

    A.    Accounts Receivable Claim ........................................................................ 10
    B.    Escrow Agreement Claim ........................................................................... 17
    C.    Christmas Party Claim ............................................................................... 20
    D.    Ice Cream Dollies Conversion Claim .......................................................... 21
    E.    Interest Claim ............................................................................................. 21
    F.    Attorneys' Fees Claim ................................................................................ 22
    G.    Conversion Claims ..................................................................................... 23
    H.    Motion for Severance ................................................................................. 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

Bandy v. First State Bank,
    835 S.W.2d 609 (Tex. 1992) ............................................................18, 19

Broadcast Music, Inc. v. Xanthas, Inc.,
    855 F.2d 233 (5th Cir. 1988) ....................................................13

Calderone v. United States,
    799 F.2d 254 (6th Cir. 1986) ......................................................3

Celotex Corp., v. Catrett,
    477 U.S. 317 (1986) ...................................................................3

City of Wichita Falls v. ITT Commercial Fin. Corp.,
    827 S.W.2d 6 (Tex. App.-Fort Worth), *rev'd in part on other grounds* ......24

Computer-Link Corp. v. Recognition Equipment, Inc.,
    670 F. Supp. 455 (D. Mass. 1987), *aff'd*, 860 F.2d 1072 (1st Cir. 1988) ..22

Eastman Kodak Co. v. Image Technical Services, Inc.,
    504 U.S. 451 (1992) ...................................................................3

In Re: F Street Investments, Inc., A Texas Corporation F/K/A Hygeia Dairy
    Company, Debtor,
    Cause No. 00-20953-B-11.........................................................23

Fontenot v. Upjohn Co.,
    780 F.2d 1190 (5th Cir. 1986) ....................................................3

Graves v. Barnes,
    700 F.2d 220 (5th Cir. 1983) ....................................................22

Green Int'l v. Solis,
    951 S.W.2d 384 (Tex. 1997) ......................................................2

Gulf S. Mach., Inc. v. Kearney & Trecker Corp.,
    756 F.2d 377 (5th Cir. 1985) ....................................................13

Int'l Sec. Life Ins. Co. v. Spray,
    468 S.W.2d 347 (Tex. 1971) ....................................................22

Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines,
    278 F.3d 494 (5th Cir. 2002) ...................................................................21

Marshall v. East Carroll Parish Hosp. Serv. Dist.,
    134 F.3d 319 (5th Cir. 1998) .....................................................................3

Morrison-Knudsen Co. v. Archer,
    655 F.2d 962 (9th Cir. 1981) ...................................................................25

Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,
    182 F.3d 157 (2nd Cir. 1999) ....................................................................3

Southwell v. University of Incarnate Word,
    974 S.W.2d 351 (Tex. App.—San Antonio 1998, pet denied) .................20

Stewart Title Guar. Co. v. Sterling,
    822 S.W.2d 1 (Tex. 1991) .......................................................................23

Texas Gas Util. v. Barrett,
    460 S.W.2d 409 (Tex. 1970) ...................................................................20

Thompson v. A.G. Nash & Co.,
    704 S.W.2d 822 (Tex. App.—Tyler 1985, no writ) ...................................22

Thompson v. Prince,
    126 S.W. 574 (Tex. Civ. App.—Waco 1939, writ ref'd) ...........................18

U.S. v. Williams,
    661 F.2d 528 (5th Cir. 1981) ...................................................................13

United Mobile Networks, L.P. v. Deaton,
    939 S.W.2d 146...........................................................................................21

Waisath v. Lack's Stores, Inc.,
    474 S.W.2d 444 (Tex. 1971) ...................................................................24

White Mountain Apache Tribe v. Hodel,
    784 F.2d 921 (9th Cir. 1986) ...................................................................25

Wilander v. McDermott Int'l,
    887 F.2d 88 (5th Cir. 1989) .....................................................................13

## STATUTES

Fed. R. Civ. P. 56(c)...........................................................................................3

Fed. R. Evid. 803(6) ............................................................................... 13

Fed. R. Civ. P. 54(b) .............................................................................. 25

Tex. Fin. Code § 304.102, 304.201 ....................................................... 21

Tex. Civ. Prac. & Rem. Code § 38.001(8) ............................................. 21

Fed. R. Bankr. P. 2004    ....................................................................... 13

Defendants Southern Foods Group, L.P. ("Southern Foods") and Suiza Foods Corporation (now Dean Foods Company, "Dean") file this Response and Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment and Conditional Motion for Severance ("Plaintiff's Motion")[1].  For the reasons stated below, Plaintiff's Motion should be denied.

## STATEMENT OF ISSUES TO RULED UPON BY THE COURT

The central issue to be decided by the Court is whether Plaintiff F Street Investments, Inc ("F Street")[2] is entitled to judgment as a matter of law on the claims addressed in Plaintiff's Motion.[3]  F Street seeks summary judgment on its claims for breach of contract, conversion, interest and attorneys' fees.  The issues are outlined briefly below and the standard of review applicable to the Court's decision as to each claim in Plaintiff's Motion is the same.

### A.    Specific Issues

The specific issues to be ruled upon by the Court are:

1.    Whether F Street has met its summary judgment burden to establish all of the essential elements of its claim for breach of contract related to the collection of accounts receivable as controlled by the Asset Purchase Agreement? No, because Southern Foods attempted to collect the old accounts receivable of F Street on a commercially reasonable basis in accordance with the APA. Southern Foods acted in good faith to apply payments received from customers that did not specify whether they were in satisfaction of F Street's old accounts receivable or Southern Foods accounts. Accordingly, F Street has failed to discharge its summary judgment burden.

---

[1]Plaintiff's Motion is referred to in this Response as "Pl.'s Mot."
[2]Plaintiff's Motion refers to F Street as "Old Hygeia".  For purposes of this Motion, there is no distinction between the use of the term "Old Hygeia" and "F Street"; Defendants refer to "F Street" to remain consistent with the previously filed Defendants' Motion for Summary Judgment.
[3]As an initial matter, Defendants note that Plaintiff's Motion fails to conform with the Southern District's Local Rules for Motion Practice and further fails to conform to this Court's rules regarding briefs and memoranda filed in support of a motion.  Plaintiff failed to include a Table of Contents, Table of Citations, Statement of Issues to be Ruled Upon by the Court, and Statement of the Nature and Stage of the Proceeding.

2.      Whether F Street has met its summary judgment burden to establish all of the essential elements of its claim for breach of contract related to the Escrow Agreement?    No, because Southern Foods authorized disbursement from the escrowed money and acted in accordance with the terms of the Escrow Agreement. F Street acknowledges, by its own motion, that Southern Foods is entitled to a portion of the escrowed funds for certain Indemnity Claims. Accordingly, F Street has failed to discharge its summary judgment burden.

3.      Whether F Street has met its summary judgment burden to establish all of the essential elements of its claim for breach of contract related to an alleged oral reimbursement agreement for Christmas parties? No, because F Street has failed to establish the existence of an agreement, an essential element of breach of contract claim.  Accordingly, F Street has failed to discharge its summary judgment burden.

4.      Whether F Street has met its summary judgment burden to establish all of the essential elements of its conversion claims?   No, because F Street has not established that Southern Foods exercised dominion or control over F Street's accounts receivables in a manner inconsistent with F Street's rights; F Street has not established that it owned, possessed or had an immediate right to possession of the escrowed funds; F Street has not established that Southern Foods has refused to return any allegedly converted property; and F Street has not established that it suffered an injury with respect to the ice cream dollies allegedly converted. Each of these are essential elements of a conversion claim.  See, e.g., Green Int'l v. Solis, 951 S.W.2d 384, 391 (Tex. 1997).  Accordingly, F Street has failed to discharge its summary judgment burden.

5.      Whether F Street has met its summary judgment burden to establish all of the essential elements of its claim for interest? No, because this claim is dependent upon the underlying breach of contract causes of action and F Street has not established all of the essential elements of breach of contract.   F Street is therefore not entitled to summary judgment and prejudgment interest is only awarded to a prevailing party. There is no statutory basis for an award of prejudgment interest and the parties did not specifically include prejudgment interest as an available damage for an alleged breach of the APA.   Accordingly, F Street has failed to discharge its summary judgment burden.

6.      Whether F Street has met its summary judgment burden to establish all of the essential elements of its claim for attorneys' fees?   No, because this claim is dependent upon the underlying breach of contract causes of action and F Street has not established all of the essential elements of breach of contract.  F Street is therefore not entitled to summary judgment on its claim for attorneys' fees.

**B.    Standard of Review Applicable to All Specific Issues**

Summary judgment is proper only if the pleadings and evidence on file show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp., v. Catrett, 477 U.S. 317, 322 (1986). The moving party must demonstrate there is no triable issue as to the matters alleged in its own pleading. Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986). To warrant summary judgment in its favor, the moving party "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in its favor." Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986). The moving party bears a "heavy burden" of demonstrating the absence of any material issues of fact. Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2nd Cir. 1999). Evidentiary facts are required to support a summary judgment motion. Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 324 (5th Cir. 1998). Conclusory statements are not sufficient. Id. Inferences drawn from the evidence must be viewed in the light most favorable to the nonmoving party. Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456 (1992). F Street is not entitled to summary judgment unless it is able to satisfy its initial burden by demonstrating there is no genuine issue of material fact as to each claim for which it seeks summary judgment. A movant that fails to satisfy this burden is not entitled to summary judgment.

## SUMMARY OF ARGUMENT

Attempting to shift blame to Defendants' for F Street's own poor accounting practices and its unwillingness to act in good faith to resolve certain payment issues, F Street filed this lawsuit and now this Motion demanding the Court's time for issues which

could have been resolved or at least narrowed by the parties. F Street asserts that it is entitled to summary judgment on its claims for breach of contract, conversion, interest and attorneys' fees. F Street also seeks a conditional Motion for Severance of Certain Claims. F Street has failed to satisfy its initial summary judgment burden by proving all the essential elements of these claims. Further, even if F Street were entitled to summary judgment on any of its claims, which it is not, F Street has not demonstrated that severance would be proper. Therefore, Plaintiff's Motion should be denied in its entirety.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

After this case was timely removed on the basis of federal question jurisdiction, this Court entered a Scheduling Order requiring the filing of initial dispositive motions on September 10, 2002. Defendants' timely filed Defendants' Motion for Summary Judgment and Brief in Support ("Defendants' Motion")[4] requesting summary judgment as to each of the claims in F Street's Original Petition. Also on September 10, 2002, F Street filed Plaintiff's Motion, to which Defendant's now respond.

## FACTUAL BACKGROUND

Some of the operative facts are not in dispute. Defendants do not dispute that F Street sold virtually all of its operating assets to Southern Foods effective November 30, 1999. There is no dispute as to the existence and execution of the Asset Purchase Agreement ("APA") and a related Escrow Agreement to document the sale. With respect to F Street's Accounts Receivable claim, Southern Foods does not dispute that the collection of Accounts Receivable is controlled by ¶ 12.14 of the APA. Southern Foods

does not dispute that it made a payment of $44,598.02 on November 27, 2000 and a payment of $31,930.07 on May 24, 2002 on F Street's old accounts receivables.[5] Regarding the Escrow Agreement claim, Southern Foods does not dispute: that the relevant provision of this Agreement is Section 3(d); that Southern Foods did not assert any Inventory Claims; that Southern Foods did assert various Indemnity Claims; that some of these Indemnity Claims are acknowledged by F Street and others are disputed.

However, there are many key facts conspicuously omitted from F Street's recitation of the operative facts. F Street fails to note that ¶ 12.14 of the APA states,

> [i]f payment is received by [Southern Foods] and the customer fails to specify whether the invoice or invoices being paid by the customer apply to [F Street's] Accounts Receivable or [Southern Foods] Accounts Receivable, the **parties agree to work together in good faith** to determine how payment should be applied between them. Any Accounts Receivable that remain uncollected as of one hundred twenty (120) days following the Closing Date [November 30, 1999], shall become the sole responsibility of [F Street] and [Southern Foods] shall have no obligation to take any further action with respect to the Accounts Receivable. (emphasis added).

F Street's explanation of the "facts" also fails to explain that F Street itself created the very accounting problems related to collection of accounts receivable about which it complains.[6]    Southern Foods merely inherited those problems.    Many of F Street's problems were attributable to the computer system installed in Fall 1999.[7] Concerned that its then-existing computer software system was not Y2K compatible, F Street installed and

---

[4]Defendants' Motion seeks summary judgment on the same claims of breach of contract and conversion that are addressed in Plaintiff's Motion. Defendants' Motion addresses many of the factual omissions and misstatements in Plaintiff's Motion. In an effort to avoid unnecessary repetition of arguments, this Response frequently refers this Court to specific portions of Defendants' Motion. The Defendant's Motion for Summary Judgment is referred to as "Defs.' Mot."

[5]F Street acknowledges that Defendants remitted $5,074,579.78 as payment for collection of F Street's old accounts receivable. Pl.'s Mot. (Ex. C) at 2, ¶ 12.

[6]Norwood Aff. (Ex. A) at 2, ¶ 3.

[7]McClarren Aff. (Ex. B) at 2, ¶ 3.

started to implement the Descartes software to address its concerns. F Street experienced glitches and problems with this software from its initial installation.[8] On at least one occasion, the software completely omitted the invoices of a customer from the first day of the month. F Street was not aware that this invoice was erased from the system until the customer notified F Street that the invoices were not part of the statement for certain dairy products.[9] This software was not specifically designed as a program to record accounts receivable in the dairy industry.[10]

Conveniently ignored in Plaintiff's Motion is the fact that Southern Foods inherited the computer system from F Street. Southern Foods attempted to use F Street's system for a period of time.[11] Southern Foods also encountered many difficulties with this software.[12] In an effort to make this computer system effective, Southern Foods hired individuals from the software manufacturer to assist with the many difficulties. This proved unsuccessful, and despite Southern Foods' best efforts and substantial expenditures to rectify the problems with F Street's system, in February 2000, Southern Foods was forced to abandon the system.[13]

F Street's recitation of the "facts" also omits the considerable effort and expense that Southern Foods went through to determine if customer checks were in satisfaction of F Street's old accounts receivables or in satisfaction of Southern Foods' accounts receivables. To make this determination, Southern Foods instituted a system whereby checks received on behalf of F Street were separated from checks received for Southern

---

[8]Id.
[9]Id.
[10]Norwood Aff. (Ex. A) at 2, ¶ 3.
[11]Id.
[12]Id.
[13]Norwood Aff. (Ex. A) at 3, ¶ 5.

Foods' accounts, all documentation was copied, and the money was placed in a general ledger account until it was transferred to F Street.[14] This system was implemented by the Wallace Norwood, the Controller of Southern Foods' San Antonio facility, as well as at least three other Southern Foods employees.[15] Following the acquisition, Southern Foods retained F Street's former employees.  For a 3-month period of time, F Street's former accounts receivable clerks were working in this same capacity for Southern Foods.[16] This system was largely effective in segregating payments and remitting those due F Street.[17]

In addition to the segregation and remittance of checks received, Southern Foods continued to use its best effort to collect on F Street's old accounts. Southern Foods used essentially the same methods employed by F Street to collect these accounts receivable by instructing sales representatives to continue with the collection of these old accounts.[18] Southern Foods' sales representatives placed phone calls and made personal visits to those customers that were behind in payments.[19]

While F Street acknowledges that it received additional payments on the collection of accounts receivable, outside of the 120 day period in which Southern Foods agreed to attempt to collect F Street's accounts receivable on a commercially reasonable basis, it once again omits material facts by failing to describe the extraordinary good faith efforts of Southern Foods to determine how unspecified payments should be applied between the

---

[14]Defs' Mot. at 10; Norwood Aff. (Ex A) at 3, ¶ 5.
[15]Norwood Aff. (Ex. A) at 3, ¶ 5.
[16]Id.
[17]"Defendant has remitted to F Street a total of $5,074,579.78 as payment for Defendants' collection of F Street's Accounts Receivable." Pl.'s Mot. (Ex. C) at 2, ¶ 12.  This is not an insubstantial sum of money.
[18]Defs.' Mot. at 9-10; McClarren Aff., (Ex. B) at 3, ¶ 6.
[19]Id.

parties.[20]   There were multiple discussions and correspondences between the parties regarding the collection of accounts receivable.[21]  F Street sent Southern Foods lists of invoices that it asserted had been paid on F Street's old accounts receivable but had not been remitted.[22]   In response, Southern Foods undertook an arduous investigation whereby boxes containing old remittances that had been sent to Oak Farms, Hygeia Dairy, and F Street were retrieved from storage and cross-checked against the lists to determine if there were any payments for F Street's old accounts receivable that were inadvertently applied to Southern Foods' accounts.  This was a process that required numerous hours on the part of several Southern Foods employees.  Because a few invoices were found to be incorrectly applied, Southern Foods sent additional checks to F Street.[23]   Despite multiple requests for any such documentation, the cancelled checks that are attached as part of Ex. C-2 to Plaintiff's Motion and asserted to be payments for F Street's old accounts receivable were <u>not</u> sent to Southern Foods until <u>after</u> Plaintiff's Motion was filed.[24]  Had these cancelled checks been sent sooner, Southern Foods would have researched whether or not the checks were in payment of F Street's old accounts receivable.[25]  This determination cannot be made by analyzing only the checks themselves.[26]  In sum, F Street's recitation of facts fails to paint a complete or accurate picture with respect to

---

[20]F Street acknowledges receipt of a payment in November 2000 in the amount of $44,598.52 and in May of 2002 in the amount of $31,930.07. Pl.'s Mot. at 6-7, ¶ 11.
[21]Norwood Aff. (Ex. A) at 4, ¶ 6.
[22]Id.
[23]Norwood Aff. (Ex. A) at 4-5, ¶ 7.
[24]Id. at 5, ¶ 8.  Defendants did not previously receive these checks in spite of formal document requests encompassing such cancelled checks.  See Def. Southern Foods Group, L.P.'s First Req. for Prod. of Docs. from Pl., Req. No. 3 and 4, (Ex. C1) authenticated by Brumbaugh Aff. (Ex. C) at 1, ¶ 3.  On several occasions Defendants have requested, both orally and in writing, that counsel for F Street produce documents responsive to Defendants previously served requests for production. Id. at 2, ¶ 4.
[25]Id.
[26]Id.at 5-6, ¶ 9.  These checks are not themselves evidence of payment on F Street's old accounts receivables for reasons described infra at 14-15.

Southern Foods' good faith efforts to attempt to collect F Street's old accounts receivable as required by the APA and Southern Foods' efforts to work with F Street to determine how unspecified payments should be applied as required by the APA.

Regarding the Escrow Agreement claim, F Street ignores the fact that as recently as May 10, 2002 Southern Foods proposed to F Street that over $355,000 be disbursed to F Street from the escrow account.[27]  Despite its pending bankruptcy and professions of financial distress, F Street has refused to take action to enable it to obtain $355,000.[28] This refusal is especially perplexing in light of the fact that F Street does not dispute, and indeed has acknowledged, that Southern Foods is entitled to $70,327.42 for asserted Indemnity Claims.[29]  Further, by its own motion, F Street admits that the amount of Southern Foods' asserted Indemnity Claims is $119,655.85 plus any additional amounts that may be incurred in the yet unresolved *Moreno* lawsuit.[30]  Nevertheless, despite these concessions, F Street persists in demanding this Court's time and asks this Court to grant a summary judgment entitling F Street to $370,000 from this escrow account.[31]

With respect to F Street's claim for reimbursement for certain Christmas parties based upon a purported oral agreement, F Street again omits material facts.  F Street fails to inform the Court of its failure to submit any invoices, receipts, or any other form of proof of payment for these parties. The reason for this omission in the face of Defendants'

---

[27]Defs' Mot. at 9; see also Ex. B2 attached to Defs.' Mot.

[28]Defs' Mot. at 9.

[29]Pl.'s Mot. at 8, ¶ 15.  In a document recently filed in F Street's bankruptcy proceeding, F Street stated that it "generally agrees" that Southern Foods is entitled to indemnity for certain claims.  See (Ex. C3).

[30]Id. F Street has stated that "indemnity is owed for expenses incurred by Southern in the defense of the the Moreno and Gonzalez cases, subject to challenge as to the amount." See (Ex. C3).

[31]Pl.'s Mot. at 9, ¶ 20; at 11, ¶ 22.

request for any such supporting documentation is obvious. There is no such substantiation nor any such "agreement".[32]

## ARGUMENT

### A.     Accounts Receivable Claim

The Requirements of the APA. Paragraph 12.14 of the APA is entitled "Collection of Accounts Receivable" and states:

> [Southern Foods] *agrees to attempt to collect* the Accounts Receivable on behalf of [F Street] on a commercially reasonable basis and forward the proceeds of its collection efforts to [F Street] within five business days following the receipt by [Southern Foods]. Payments received by [Southern Foods] which apply to both [Southern Foods'] and [F Street's] accounts receivable shall be paid to [F Street] in the amount equal to the portion of the payment attributed to the Accounts Receivable of [F Street]. If payment is received by [Southern Foods] and the customer fails to specify whether the invoice or invoices being paid by the customer apply to [F Street's] Accounts Receivable or [Southern Foods] Accounts Receivable, the *parties agree to work together in good faith* to determine how payment should be applied between them. Any Accounts Receivable that remain uncollected as of one hundred twenty (120) days following the Closing Date [November 30, 1999], shall become the sole responsibility of [F Street] and [Southern Foods] shall have no obligation to take any further action with respect to the Accounts Receivable. (emphasis added).

This provision obligated Southern Foods to attempt to collect receivables but was not a guarantee that any amount would be collected.[33] The parties clearly contemplated situations in which payments would be received and the customer would fail to specify whether the invoice(s) applied to on old F Street account or a Southern Foods account. In these situations, the parties agreed to work together in good faith to determine how payment should be applied. Southern Foods has consistently acted in good faith to apply these unspecified payments; there is no competent summary judgment evidence to the

---

[32]See (Ex. C1), Req. No. 13.
[33]Defs' Mot. at 9.

contrary. F Street, however, has engaged in a pattern of disingenuous conduct with respect to the accounts receivable dispute.

Southern Foods' Efforts to Collect. In the acquisition, Southern Foods inherited F Street's Descartes computer program for the accounting of accounts receivable.[34] This program was not specifically designed for the collection of accounts receivable in the dairy industry, and F Street encountered problems with the program.[35] Because it was not feasible to immediately convert the information contained in F Street's program to Southern Foods' collection system, Southern Foods hired individuals from the manufacturer of the software in an attempt to make this program effective.[36] Despite Southern Foods' substantial efforts to rectify the problems with F Street's system, in February 2000, Southern Foods was forced to abandon F Street's system.[37]

After February 2000, Southern Foods instituted a system whereby checks received on behalf of F Street were separated from checks received for Southern Foods accounts (where it was possible to make this determination), all the documentation was copied, and the money was placed in a general ledger account until it was transferred to F Street.[38] Customers generally did not indicate which checks were meant as payments for which accounts, by reference to invoice number or other means. Therefore, it was not a simple process to attempt to collect and remit these payments appropriately. This process was further complicated by the fact that F Street had multiple branch locations to which customers would send checks.[39] All checks received at the former F Street branches were

---

[34]Norwood Aff. (Ex. A) at 2, ¶ 3; supra at 5-6.
[35] Id.
[36] Id.
[37] Id. at 3, ¶ 5.
[38] Id.
[39] Id.; McClarren Aff. (Ex. B) at 2-3, ¶ 4.

forwarded to a single location where they could then be entered into the general ledger account. At least four Southern Foods' employees were needed to implement the system of collecting and segregating accounts receivable payments.[40]  F Streets former accounts receivable clerks were retained by Southern Foods for a period of time and were involved in this process.[41] Southern Foods devoted substantial resources collecting and accounting for payments on F Street's old accounts receivable.

F Street contends that Southern Foods failed to remit payments for F Street's old accounts receivable. F Street's contention is wrong for several reasons.  First, the undisputed evidence does not support this argument.  In fact, the evidence is directly to the contrary and conclusively establishes Defendants' right to summary judgment.[42] Southern Foods instituted a system to accurately account and distribute the money it received as payment for F Street's accounts.  As previously addressed, until February 2000, Southern Foods used F Street's computer system to record and post checks received on behalf of F Street.  Thereafter, Southern Foods segregated the checks received on behalf of F Street, all documentation was copied, and the money was placed in a general ledger account until transferred to F Street.  Second, much of F Street's "evidence" is inadmissible hearsay and therefore incompetent summary judgment evidence. For example, the lists and cancelled checks attached as Exhibits C-1 and C-2 to Plaintiff's Motion are inadmissible hearsay.  Exhibit C-1, entitled "Open Invoices- Customer Says Have Been Paid", is apparently a spreadsheet summarizing the alleged contents of conversations with F Street's former customers.  It is a cumulation of hearsay evidence.  F

---

[40] Norwood Aff. (Ex. A) at 3, ¶ 5.
[41] Id.
[42] See Defs. Mot. at 10.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**- Page 12
761787.4/SP2/75935/0208/092702

Street's assertion that its compilations of hearsay statements in Exs. C-1 and C-2 are records kept in the regular course of business does not save F Street and it is clear that these "records" were created solely for purposes of this litigation.[43] F Street attempts to fit these inadmissible hearsay documents into the business record exception of Fed. R. Evid. 803(6) fails.[44] It is apparent these exhibits were created in anticipation of litigation and not retained in the course of regularly conducted business or that it was regular business activity. See U.S. v. Williams, 661 F.2d 528, 530 (5th Cir. 1981); Broadcast Music, Inc. v. Xanthas, Inc., 855 F.2d 233 (5th Cir. 1988). Finally, the circumstances of preparation of these documents indicate lack of trustworthiness. See Williams at 661 F.2d 530. They were not made at or near the time or event they record.[45]

F Street's attempt to use the deposition testimony of Wallace Norwood from a different legal proceeding is likewise inappropriate.[46] Mr. Norwood was deposed on November 20, 2001 in F Street's bankruptcy proceeding pursuant to Bankruptcy Rule 2004.[47] This examination occurred prior to F Street's filing this lawsuit against Southern

---

[43]This assertion is contradicted by the affidavit of Mr. McClarren, a former F Street officer familiar with F Street's record keeping process. In fact, it was not in the regular course of business for F Street to create or record the information contained in Plaintiff's Exhibits C-1 and C-2. McClarren Aff. (Ex. B) at 3, ¶ 7.

[44]Before the business record exception is satisfied, five requirements must be met: 1). the record must have been made at or near the time of the event it records; 2). the record has been prepared by, or from information transmitted by, a person with knowledge of the matters recorded; 3). the record has been retained in the regular course of regularly conducted business activity; 4). it was the regular business activity to make a record of that nature; and 5). the exception will not apply if the source of information or the method or circumstances of preparation indicate lack of trustworthiness. Fed. R. Evid. 803(6); Wilander v. McDermott Int'l, 887 F.2d 88, 91 (5th Cir. 1989).

[45]Additionally, based upon the dates of the various faxes attached to Exhibit C-2, F Street fails to satisfy the business record requirement that the record be made "at or near the time" of the event that it records. See Gulf S. Mach., Inc. v. Kearney & Trecker Corp., 756 F2d. 377 (5th Cir. 1985).

[46]See Pl.'s Mot. (Ex. U).

[47]Under Fed. R. Bankr. P. 2004, "The examination of an entity under this rule…may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge."

Foods.[48] It is hearsay not subject to any exceptions and should not be offered against Southern Foods.

Remarkably, F Street has the temerity to use Southern Foods' responses to certain requests for admissions as "proof" that Southern Foods purportedly collected but did not remit to F Street certain accounts receivable. On July 22, 2002, F Street sent Defendant Southern Foods a Second Set of Requests for Admissions and Request for Production of Documents.[49] This document totaled 430 pages and contained 3,383 separate requests for admissions and 3,383 separate requests for production of documents. The sheer number of these requests showed on their face that they were unduly burdensome. Despite the outrageous nature of these requests, Southern Foods undertook the tedious and expensive process of responding to these requests. F Street now asks this Court to consider as summary judgment evidence its claim that Southern Foods denied receipt of payment for a few of these invoices while F Street had copies of the customers cancelled checks as purported proof of payment and withheld them from Defendant. This "evidence" should be rejected by the Court.

No Proof that Invoices and Checks are F Street's Old Accounts Receivable. Southern Foods has examined the invoice list and the checks attached as Ex. C-2 of Plaintiff's Motion. Prior to the week of September 16, 2002, these cancelled checks were

---

[48]The examination of Mr. Norwood occurred on November 20, 2001. Plaintiff's Original Petition was filed in state court on November 30, 2001.
[49]See Pl.'s Mot. (Ex. T) which is Def. Southern Foods Group, L.P.'s Resps. to Pl. F Street Investments, Inc.'s Second Set of Reqs. for Adms. and Reqs. for Prod.

not provided to Southern Foods.[50]  Had this information been provided to Southern Foods at an earlier time, Southern Foods could have investigated this list.[51]  By waiting to produce this documentation until the filing of Plaintiff's Motion, F Street is demanding Court intervention in a matter that could have been resolved in good faith by the parties as required by the APA.

There is no indication on the checks themselves that any of them are in satisfaction of F Street's old accounts receivable.[52]  Southern Foods continued to serve these accounts after the acquisition.  The name "Hygeia Dairy Company" was part of the assets acquired by Southern Foods from F Street.[53]  Therefore, the fact that these checks are written to Hygeia Dairy Company as opposed to Southern Foods or Oak Farms is not conclusive proof that these checks were written in satisfaction of F Street's old accounts receivable.[54]  The checks attached as part of Ex. C-2 are dated either on or after the date of the acquisition.  With just a few exceptions, there is no proof on the face of the checks that they are in satisfaction of a particular invoice, much less of F Street's invoices.  Southern Foods has located no support in its records that these checks were incorrectly applied to Southern Foods' accounts instead of F Street's old accounts.[55]

---

[50] Norwood Aff. (Ex. A) at 5, ¶ 8. These checks were not provided in response to formal discovery requests from the defendants to plaintiff.  See (Ex. C1), Req. No. 3 and 4. Defendants have, both orally and in writing, requested that counsel for F Street produce documents responsive to Defendants requests for production. Brumbaugh Aff. (Ex. C) at 2, ¶ 4; see also (Ex. C2).  The fact that these documents were not previously produced in spite of formal requests by Defendants is sufficient grounds for the Court to reject consideration of these cancelled checks attached to Pl.'s Mot.

[51] Id.

[52] Id. at 5-6, ¶ 9.

[53] Defs. Mot. at 1, note 1.

[54] Id.

[54] Id.

[55] Id.

F Street's Dilatory and Disingenuous Conduct.  F Street engaged in a pattern of dilatory and disingenuous conduct with respect to the accounts receivable issue. The cancelled checks attached to Plaintiff's Motion as Ex. C-2 were not provided to Southern Foods until the week of September 16, 2002.  Had this information been produced earlier, as required as part of a good faith effort under the APA, Southern Foods could have investigated this information against its own records to determine if any payments were made on F Street's old accounts.[56]  Instead, F Street opted to "lay behind the log" with this information in the hopes that it would obtain some sort of calculated litigation advantage. This tactic failed. Southern Foods has located no evidence in its records that any of these payments were for F Street's old accounts.

As discussed above, F Street attempts to persuade this Court with documents that are incompetent summary judgment evidence.  Plaintiff's Exs. C-1 and C-2 are hearsay not subject to any exception. Accordingly, they should not be considered as evidence by the Court.  If considered for any purpose, these lists and cancelled checks are evidence of F Street's continued disingenuous conduct with respect to the accounts receivable.

Perhaps the most egregious example of F Street's disingenuous conduct is its argument related to Southern Foods responses to F Street's Second Requests for Admissions and Requests for Production of Documents.[57]  F Street asks this Court to believe that Southern Foods is the party that has not acted in good faith in accordance with the APA. Yet, it is F Street that sent Southern Foods 3,383 separate requests for admissions and 3,383 separate requests for production while at the same time withholding

---

[56] Id.

[57] See Pl.'s Mot. (Ex. T) which is Def. Southern Foods Group, L.P.'s Resps. to Pl. F Street Investments, Inc.'s Second Set of Reqs. for Adms. and Reqs. for Prod.

copies of cancelled checks that could have aided Southern Foods in its investigation. F Street has failed to meet its summary judgment burden to establish all of the essential elements of its breach of contract claim related to the accounts receivable issue. Therefore, F Street's motion for summary judgment on the accounts receivable claim should be denied.

## B.    Escrow Agreement Claim

A Mountain out of a Mole Hill. Southern Foods has, on numerous occasions both before and after F Street filed this lawsuit, request that the escrowed money be disbursed to the parties.[58] As recently as May 10, 2002, Southern Foods proposed to F Street that $355,344.15 be disbursed to F Street from the escrow account, with approximately $96,000 disbursed to Southern Foods.[59] F Street refused. F Street filed Plaintiff's Motion asserting entitlement to $370,000 from the escrowed funds.[60] Plaintiff's Motion demands this Court's time to resolve a claim which could and should have been resolved had F Street made the effort. To put this in perspective, Southern Foods paid over $9 million dollars for F Street's assets, collected and remitted over $5 million dollars in old accounts receivable on behalf of F Street, and previously authorized disbursement of $500,000 to F Street from the escrowed money.

Southern Foods' Acknowledged Indemnity Claims. F Street acknowledges that Southern Foods asserted certain Indemnity Claims under the APA and does not dispute claims in an amount of $70,327.42.[61] Remarkably, F Street acknowledges these

---

[58] Defs.' Mot. at 9; Defs.' Mot. (Ex. B1).

[59] Id.

[60] Pl.'s Mot. at 9, ¶ 20. While F Street refers to Exhibits B, D, E, J & M in support of its request for disbursement of $370,000 from the escrow account, none of these exhibits demonstrate that $370,000 is an accurate calculation.

[61] Pl.'s Mot. at 8, ¶ 15.

Indemnity Claims yet stubbornly refuses to authorize a disbursement from the escrow account to Southern Foods (a disbursement that would provide F Street in excess of $355,000). F Street's only defense to its refusal to authorize disbursement from the escrowed money for these claims is an asserted "right" of setoff.[62] As discussed below, F Street has no legal right of setoff. Southern Foods has shown that it attempted to collect the accounts receivable on a commercially reasonable basis and that it further acted in good faith to apply customer payments that did not specify an account or invoice.[63] Accordingly, there is no breach or claim that would entitle F Street to a setoff based upon accounts receivable.

F Street's claims do not satisfy the essential elements for a setoff under Texas law.[64] To be entitled to a setoff for competing claims, the claims themselves must be claims relating to both parties, must have sufficient mutuality, and must be due to the same right or capacity. Thompson v. Prince, 126 S.W. 574, 576 (Tex. Civ. App.—Waco 1939, writ ref'd). The conditions permitting disbursement from the Escrow Agreement are distinct from the "Collection of Accounts Receivable" provision of the APA and the Escrow Agreement imposes specific obligations and duties on the third-party escrow agent, an entity not involved in the accounts receivable claim.[65] In support of its asserted right of setoff, F Street cites cases in Plaintiff's Motion that are readily distinguishable from the facts here.[66] In the case principally relied upon by F Street, Bandy v. First State Bank, 835 S.W.2d 609 (Tex. 1992), the defendant bank had a statutory right to setoff under the Texas

---

[62] Pl.'s Mot. at 9-10, ¶ 20. F Street asserts this right to setoff in Pl.'s Mot. but it failed to make any mention of a claim for setoff in a filing recently made in its bankruptcy proceeding. See (Ex. C3).
[63] See supra at 5-8.
[64] See Defs.' Mot. at 18, note 61.
[65] Id.
[66] Pl.'s Mot. at 10, ¶ 20, note 4.

Probate Code. Because there was a statutory right to setoff, the Texas Supreme Court next considered the extent of that right. Bandy 835 S.W.2d at 618. Plaintiff's reliance on a statutory right of setoff provided in the Probate Code is inapplicable here. Accordingly, there is no legal basis for F Street's continued refusal to authorize release of funds from the escrow account. Put simply, F Street has no statutory right to setoff and has not satisfied the elements of setoff under Texas law.

Purpose of the Escrow Agreement. The purpose of the Escrow Agreement was to protect Southern Foods and to satisfy any indemnity, inventory, or environmental claims as those terms were defined in the APA.[67] The Escrow Agreement is intended to protect Southern Foods from lawsuits such as the Gonzalez and Moreno claims. F Street acknowledges that Southern Foods is entitled to reimbursement for the defense of these claims.[68] F Street's unsolicited opinions regarding Southern Foods' defense strategy in the Moreno suit have no bearing on the issue before the Court. The Moreno suit is still pending; until it reaches a final judgment there is a possibility that the fees incurred by Southern Foods will increase. In addition, there is the continued possibility of a judgment against Southern Foods in the Moreno suit, even if the amount of such a claim is limited. It is ironic that F Street complains that $170,000 of its property has been "tied up by Defendants for almost two years..." yet F Street refuses a disbursement entitling it to over $355,000.[69] F Street has failed to meet its summary judgment burden to establish all of the essential elements of its claim for breach of contract claim based upon the Escrow

_____

[67] Defs.' Mot. at 19.
[68] See (Ex. C3).
[69] Pl.'s Mot. at 11, ¶ 21; supra at 8-9.

Agreement. Therefore, F Street's motion for summary judgment on the alleged breach of the Escrow Agreement should be denied.

**C.    Christmas Party Claim**

No Competent Evidence of Alleged Reimbursement Agreement. F Street relies on the conclusory allegations of its President, Doug Purl, in support of its claim for reimbursement for certain Christmas parties based upon a purported oral agreement.[70] Before a party can breach an agreement, there must be a showing that there was a valid enforceable contract between the parties. Southwell v. University of Incarnate Word, 974 S.W.2d 351, 354-55 (Tex. App.—San Antonio 1998, pet. denied). F Street's conclusory allegations fail to demonstrate the necessary element of a mutuality of obligations supporting the contract between the parties. Texas Gas Util. v. Barrett, 460 S.W.2d 409, 412 (Tex. 1970). F Street alleges that the expenses incurred for the Christmas parties at the Harlingen and Corpus Christi plants was $7,135.00.[71] However, F Street has not provided this Court (nor has it ever provided Southern Foods) with any supporting proof of these expenses such as receipts or any other form of proof of payment for these parties. F Street's failure to provide such proof, despite Defendants' formal request for any such documentation[72], calls into serious question the existence of any such reimbursement agreement. F Street has failed to meet its summary judgment burden to establish all of the essential elements of its claim for breach of contract claim based upon a purported agreement. F Street's motion for summary judgment on the alleged breach of a purported reimbursement agreement should be denied.

---

[70] Pl.'s Mot. (Ex. C) at 3, ¶ 24.
[71] Id. at ¶ 25.
[72] See Def. Southern Food Group, L.P.'s First Req. for Prod. of Docs. to Pl.; Request No. 13, Ex. C1.

**D.    Ice Cream Dollies Conversion Claim**

As previously addressed in Defendants' Motion, F Street is wrong in its allegation that Defendants converted ice cream dollies and that had the ice cream dollies been returned they "would have been counted as inventory and increased the sale price."[73] "Inventory" is a defined term under the APA and does not include ice cream dollies.[74] The dollies, allegedly worth $6,325.02, would not have increased the $9,113,000.00 purchase price.  F Street has therefore suffered no damage, a requisite element of a conversion claim.  United Mobile Networks, L.P. v. Deaton, 939 S.W.2d 146, 147-148.  Accordingly, F Street's request for summary judgment on the alleged ice cream dollies conversion claim should be denied.

**E.    Interest Claim**

Under Texas law, prejudgment interest can only be awarded on the basis of an enabling statute or general principles of equity.  Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines, 278 F.3d 494, 499 (5th Cir. 2002).  Statutory prejudgment interest applies only to judgments in wrongful death, personal injury, property damage, and condemnation cases.  Tex. Fin. Code § 304.102, 304.201; Id.  None of F Street's claims is encompassed by the applicable statute; therefore, as a matter of law, F Street has no statutory right to interest. F Street could only claim interest on its contract claims, if at all, under principles of equity and only if it is a prevailing party.  F Street has established no basis for any such equitable relief and it has not demonstrated that is entitled to summary judgment on any of its

---

[73] Pl.'s Mot. at 12, ¶ 26; Defs'. Mot. at 24.
[74] Pl.'s Mot. (Ex. A) at 4, ¶ 1.24.  Paragraph 1.24 of the APA states "Inventory means all inventories of [F Street] including fluid raw milk and other raw materials and ingredients, finished processed milk, ice cream and other dairy and dairy related products, packing materials, other raw materials used to process ice cream and other dairy and dairy related products and parts; provided that such inventories are not out of code and are usable by [Southern Foods] in conducting Business after the Closing."

claims. Therefore, F Street is not entitled to prejudgment interest in equity and its request for summary judgment on the interest claim should be denied.[75]

**F.     Attorneys' Fees Claim**

F Street has not demonstrated that is entitled to judgment as a matter of law on its claims. As shown in this Response, F Street has failed to meet its initial summary judgment burden on its claims. Therefore, F Street is not entitled to attorneys' fees as a prevailing party under the applicable APA provision or relevant Texas law.[76]

An award of attorneys' fees is generally a fact issue that must be supported by competent evidence. Int'l Sec. Life Ins. Co. v. Spray, 468 S.W.2d 347, 349 (Tex. 1971). A judgment for attorneys' fees in summary proceedings must be supported by evidence. Thompson v. A.G. Nash & Co., 704 S.W.2d 822, 824 (Tex. App.—Tyler 1985, no writ). Plaintiff has not offered competent summary judgment on its attorneys' fees claim. The affidavit of Nathaniel Peter Holzer, counsel for F Street, on which F Street relies is deficient. It fails to properly apply the lodestar calculation for attorney's fees. Graves v. Barnes, 700 F.2d 220, 222 (5th Cir. 1983)("lodestar" calculation is the standard method for calculating attorneys' fees in the 5th Circuit). The lodestar amount is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work. Id. Though the affidavit states an hourly rate for the work incurred, there is no

---

[75] F Street does not rely on the APA for its request for interest nor could it. Paragraph 13.9 of the APA addresses the possibility that any action could be brought by a party to the APA "to determine a breach of this Agreement and obtain damages as a result of such breach...." It states a prevailing party shall to recover its "out-of-pocket costs and expenses, including, without limitation, all reasonable attorney's fees, disbursements and related charges." The parties addressed a potential breach claim but did not include prejudgment interest as an element of damage. A limitation of damages provision may preclude an award of prejudgment interest to a prevailing party. Computer-Link Corp. v. Recognition Equipment, Inc., 670 F. Supp. 455 (D. Mass. 1987), aff'd, 860 F.2d 1072 (1st Cir. 1988).
[76] Pl.'s Mot. (Ex. A) at 38, ¶ 13.9; Tex. Civ. Prac. & Rem. Code § 38.001(8).

evidence that it is the prevailing hourly rate in the community for similar work.[77] There is no calculation of the number of hours reasonably expended in this matter.[78] Moreover, in an apparent effort to saddle Defendants with attorney's fees incurred by F Street in other legal proceedings, F Street's counsel also fails to segregate attorneys' fees incurred on claims for which attorney's fees are not authorized from those claims on which fees might be authorized as required under Texas law. Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10-11 (Tex. 1991). For example, Holzer's affidavit states that the fee calculation includes the deposition of Mr. Norwood.[79] The deposition was taken in connection with F Street's pending bankruptcy, not as part of the matter presently before this Court.[80] The affidavit is not competent evidence due to its failure to segregate certain fees. Having failed to prevail on its request for summary judgment for the contract claims and having submitted incompetent evidence in any event, F Street's request for attorney's fees must be rejected.

## G.    Conversion Claims

F Street cannot establish the essential elements of a conversion claim with respect the allegedly converted ice cream dollies, the accounts receivable, or the escrowed funds. As the evidence conclusively establishes that Defendants are entitled to summary judgment on these claims, it is clear that F Street has failed to meet its summary judgment burden to establish all of the essential elements of its claim.

---

[77] See Pl.'s Mot. (Ex. R) at 2, ¶ 6.

[78] Id.

[79] Id.

[80] See Pl.'s Mot. (Ex. U). The deposition was taken as part of the bankruptcy proceeding styled "In Re: F Street Investments, Inc., A Texas Corporation F/K/A Hygeia Dairy Company, Debtor, Cause No. 00-20953-B-11" pending in the United States Bankruptcy Court for the Southern District of Texas, Brownsville Division.

As briefed in Defendants' Motion[81], to prove conversion based upon the alleged failure to collect accounts receivable, F Street must establish Southern Foods wrongfully exercised dominion and control over F Street's property in a manner inconsistent with F Street's rights.  <u>Waisath v. Lack's Stores, Inc.</u>, 474 S.W.2d 444, 447 (Tex. 1971).  Any "control" that Southern Foods had over payments of F Street's old accounts was pursuant to the APA and strictly on behalf of F Street.[82] Southern Foods did <u>not</u> wrongfully exercise dominion and control over F Street's accounts receivable in a manner inconsistent with F Street's rights.  Further, F Street did not own, possess or have an immediate right to possession of the funds in the Escrow Agreement.  As there are acknowledged Indemnity Claims that still have not been disbursed to Southern Foods, F Street only has a future interest in the escrowed funds.  A plaintiff who has only a future interest in the property cannot sue for conversion.  <u>City of Wichita Falls v. ITT Commercial Fin. Corp.</u>, 827 S.W.2d 6, 9-10 (Tex. App.-Fort Worth), *rev'd in part on other grounds*, 835 S.W.2d 65 (Tex. 1992).  F Street has failed to meet its summary judgment burden to establish all of the essential elements of its conversion claims related to the ice cream dollies, the accounts receivable, and the escrowed funds.  Therefore, F Street's motion for summary judgment on the conversion claims should be denied.

## H.    Motion for Severance

F Street requests that any summary judgment granted as to both liability and amount be severed from the case and a final order be entered.[83] However, F Street has not satisfied its initial summary judgment burden as to any of the claims in its Motion.  To

---

[81] Defs.' Mot. at 22-24.
[82] See Pl.'s Mot. (Ex. A) at 35; see supra at p. 9.
[83] Pl.'s Mot. at 15, ¶ 35.

the contrary, the evidence conclusively establishes the Defendants' right to summary judgment. Even in the unlikely scenario that this Court finds F Street is entitled to summary judgment on any of its claims, severance would nevertheless be inappropriate. Partial judgments under Fed. R. Civ. Pro. 54(b) are reserved for unusual cases where the risk of "scattershot disposition of litigation" is outweighed by the pressing need for an early judgment. Morrison-Knudsen Co. v. Archer, 655 F.2d 962, 965 (9th Cir. 1981). F Street has not even attempted to demonstrate that this is an unusual case with a pressing need for an early judgment. Further, "[a] similarity of legal or factual issues will weigh heavily against entry of judgment under (Fed. R. Civ. Pro. 54(b))". Id. at 962. Severance is improper where it would result in duplicative proceedings with the remaining claims. See White Mountain Apache Tribe v. Hodel, 784 F.2d 921 (9th Cir. 1986).

## CONCLUSION

F Street has not satisfied its initial burden to entitle it to summary judgment on the claims addressed in Plaintiff's Motion. On the contrary, as shown here and in Defendants' Motion for Summary Judgment, the undisputed facts conclusively prove that Defendants are entitled to summary judgment.

Defendants therefore respectfully request that this Court deny Plaintiff's Motion for Partial Summary Judgment and Conditional Motion for Severance and grant Defendants' Motion for Summary Judgment.

DATED: September 30, 2002.

Respectfully submitted,

JERRY L. BEANE
Attorney-in-Charge
State Bar No. 01966000
Southern Dist. Bar No. 8993
KAY LYNN BRUMBAUGH
State Bar No. 00785152
Southern Dist. Bar No. 21341
STRASBURGER & PRICE, L.L.P.
901 Main Street, Suite 4300
Dallas, Texas 75202
(214) 651-4300
(214) 651-4330 (Telecopier)

AND

EDUARDO R. RODRIGUEZ
State Bar No. 17144000
Southern Dist. Bar No. 1944
ALISON KENNAMER
State Bar No. 112804000
Southern Dist. Bar No. 12023
RODRIGUEZ, COLVIN & CHANEY
1201 East Van Buren
Brownsville, Texas 78522
(956) 542-7441
(956) 541-2170 (Telecopier)

**ATTORNEYS FOR DEFENDANTS
SOUTHERN FOODS GROUP, L.P.
AND SUIZA FOODS CORPORATION
(NOW DEAN FOODS COMPANY)**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been forwarded to all counsel of record on this the 30th day of September, 2002 via U.S. Mail, and that the motion and brief have also been forwarded to plaintiff's counsel via electronic mail per the agreement of counsel.

KAY LYNN BRUMBAUGH    by permission GMS

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| F STREET INVESTMENTS, INC. | § | |
| A TEXAS CORPORATION F/K/A | § | |
| HYGEIA DAIRY COMPANY | § | |
| | § | |
| v. | § | CIVIL ACTION B-0001 |
| | § | |
| SOUTHERN FOODS GROUP, L.P. AND | § | |
| SUIZA FOODS CORPORATION | § | |

### DEFENDANTS' APPENDIX OF RESPONSE EVIDENCE

| Exhibit | Description |
|---|---|
| A | Affidavit of Wallace Norwood |
| B | Affidavit of Scott McClarren |
| C | Affidavit of Kay Lynn Brumbaugh |
| C1 | Defendant Southern Foods Group, L.P.'s First Request for Production of Documents from Plaintiff |
| C2 | August 29, 2002 Correspondence from Defendant's Counsel to Plaintiff's Counsel |
| C3 | Joint Disclosure Statement (as modified) of Debtor, Cohyco, Inc., and the Official Committee of Unsecured Creditors for Joint Plan (as modified) of Debtor, Cohyco, Inc., and Official Committee of Unsecured Creditors for Reorganization of F Street Investments, Inc. F/K/A Hygeia Dairy Company |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| F STREET INVESTMENTS, INC. | § | |
| A TEXAS CORPORATION F/K/A | § | |
| HYGEIA DAIRY COMPANY | § | |
| | § | |
| v. | § | CIVIL ACTION B-02-001 |
| | § | |
| SOUTHERN FOODS GROUP, L.P. AND | § | |
| SUIZA FOODS CORPORATION | § | |

## AFFIDAVIT OF WALLACE NORWOOD

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

Wallace Norwood, being duly sworn, states as follows:

1.     My name is Wallace Norwood. I am the same Wallace Norwood who provided an affidavit in this lawsuit in connection with Defendants' Motion for Summary Judgment previously filed with this Court. I am over 18 years of age and am competent to make this Affidavit. I have never been convicted of a felony. I have personal knowledge of the facts stated in this Affidavit, and I know them to be true and correct.

2.     I am employed as the Controller of Operations for the San Antonio facility of Southern Foods Group L.P.'s ("Southern Foods"). After Southern Foods acquisition of Hygeia Dairy Company (now F Street Investments, Inc.), I had supervisory responsibility for attempting to ensure that payments for F Street Investment, Inc.'s ("F Streets") accounts receivable were separated from payments received for Southern Foods' accounts, and that the F Street payments were then remitted to F Street. This was a challenging task for a number of reasons.



3.      Southern Foods inherited a flawed accounts receivable system and computer system from F Street in the acquisition. Southern Foods did not have access to the F Street "Descartes" computer system until December 1, 1999, the day after the acquisition of F Street by Southern Foods. The computer system had not been fully implemented by F Street at the time of the acquisition. F Street only started to test the computer system at the end of October, 1999. At the time of testing, it was considered a shell program because it was not yet fully integrated and installed. When the acquisition was announced, F Street halted all work on the implementation of this system. Further, the computer system utilized by F Street was not specifically designed to record payments of accounts receivable and was not very well developed. Southern Foods encountered many pricing and billing errors directly attributable to the F Street computer system. In an effort to make this computer system effective, Southern Foods hired individuals from the maker of the "Descartes" computer program to assist with the many difficulties.[1] Notwithstanding the numerous flaws in F Street's collection and accounting systems and the resulting difficulties they caused, Southern Foods went to great efforts to attempt to collect and remit to F Street any payments that could be determined to be in satisfaction of F Street's old accounts receivable.

4.      After the acquisition, it was not feasible to immediately convert F Street's system to Southern Foods' more accurate accounting system. F Street served in excess of 100 routes and it took time to accurately convert the information from these routes and customers to Southern Foods' system. Prior to this conversion, Southern Foods' was forced to utilize F Street's problematic system to access this information. F

---

[1] A Canadian manufacturer produces the "Descartes" system. In addition to spending money for the actual work performed to attempt to improve and fix this software, Southern Foods also paid the travel expenses between Canada and Harlingen for these individuals as well as per diem expenses.

Street did not have any financial reports, outside of the information on the computer system, that Southern Foods could utilize to make this conversion.

5.    Despite Southern Foods' best efforts and substantial expenditures to rectify the problems with F Street's computer system, in February of 2000 Southern Foods was forced to abandon the problematic computer system that Southern Foods inherited from F Street.  At that point, Southern Foods instituted a practice whereby checks received by Southern Foods which appeared to be possible payments on F Street's old accounts receivable were separated from those received on Southern Foods' accounts (where it was possible to make this determination), all the documentation was copied, and the money was placed in a general ledger account until it was transferred to F Street.  Because customers generally did not indicate which checks were meant as payment for which accounts, by reference to invoice number or other means, it was not a quick or simple process.  Additionally, because F Street had multiple branch locations, in Laredo, Texas and McAllen, Texas for example, the customers did not send the checks to a single location.  This necessitated that all checks received from the various branches of F Street be sent to a single location where they could be entered into either the Descartes system or later entered into a general ledger. In addition to me, there were at least 3 other Southern Foods' employees who worked to implement the system of segregating accounts receivable payments.  Initially following the acquisition, all of F Street's former employees were hired by Southern Foods.  F Street's former accounts receivable clerks were working in this same capacity for Southern Foods until the accounts receivable department was moved to the Corpus Christi facility in March 2000.

6.    I discussed the collection of F Street's old accounts receivable with Doug Purl, the current President of F Street.  On several occasions following the acquisition, he sent me lists of invoices that he asserted were still "open".  Open invoices were those that allegedly had been paid on F Street's old accounts receivable but had not been remitted to F Street.  Southern Foods employees would review these lists and if any money was due, it was transferred to F Street.   The money was originally transferred directly to an F Street account.  Thereafter, a check was sent to F Street in the amount of $44,598.52, a copy of which appears to be attached as Exhibit C-3 of Plaintiff's Motion for Partial Summary Judgment and Conditional Motion for Severance ("Plaintiff's Motion").   At one point, Mr. Purl and I specifically discussed these lists and the progress of Southern Foods in the collection of F Street's old accounts receivable. Mr. Purl indicated that he thought Southern Foods was very close to having all of the old accounts collected and remitted to F Street.

7.    On or about May 2001, Mr. Purl sent another list to me which also included check numbers and dates of checks for payments that he alleged were paid on F Street's old accounts but had not been remitted to F Street.  In response to receipt of this list, I requested that certain boxes of documents be retrieved from storage.  Many of these boxes had to be retrieved from our Corpus Christi, Texas and McKinney, Texas facilities.  Approximately 10 boxes with 500 checks and advices per box were retrieved and sent to me in San Antonio.    I personally and with the assistance of others in my office, went through these boxes containing copies of old remittances that were sent to Oak Farms, Hygeia Dairy, and F Street.[2]  I attempted to match these remittances to the

---

[2]As discussed in my prior affidavit, Oak Farms is the assumed name under which Southern Foods sells dairy products throughout Texas.  Additionally, the remittances to F Street would actually be sent to "Hygeia Dairy," the name under which F Street formerly operated.

list provided by Mr. Purl to determine if there were any payments for F Street's old accounts receivable that were inadvertently incorrectly applied to Southern Foods' accounts. Finding a few invoices that were incorrectly applied to Southern Foods' accounts instead of F Street's accounts, I requested that a check in the amount of $31,930.07 be paid to F Street. Because of the time required in the retrieval of the documents and the cross-checking process, there was a period of time that elapsed between receipt of the list and payment to F Street. In sum, I and other Southern Foods' employees spent numerous hours in a good faith effort to investigate and determine what, if any, payment was owed to F Street for its old accounts receivable.

8.     These lists that Mr. Purl sent me prior to F Street's filing this lawsuit were similar to the list attached as Exhibit C-1 to Plaintiff's Motion. However, Mr. Purl never forwarded to me, despite my multiple requests, any cancelled checks that he claims were in satisfaction of F Street's old accounts receivable. Indeed, no cancelled checks were provided to me until F Street filed Plaintiff's Motion. Had F Street provided these cancelled checks to me sooner, I could have already researched whether or not the checks were in payment of F Street's old accounts receivable.

9.     I have examined each of the checks attached as exhibit C-2 to Plaintiff's Motion. As explained above, prior to the week of September 16, 2002, I had never seen any of these cancelled checks. From analyzing these checks, there is no indication on the checks themselves that any of them are in satisfaction of F Street's old accounts receivable. The mere existence of the accounts referenced in F Street's exhibit C-2 at the time of Southern Foods' November 30, 1999 acquisition of F Street does not necessarily mean that these checks were paid in satisfaction of F Street's old accounts receivable. Southern Foods continued to serve many of these accounts after the

acquisition. Further, the name "Hygeia Dairy Company" was part of the assets acquired by Southern Foods from F Street. Therefore, the fact that these checks were written to Hygeia Dairy Company is not conclusive proof that these checks were written in satisfaction of F Street's old accounts. Each of the checks attached as part of F Street's Exhibit C-2 is dated on or after the date of Southern Foods' acquisition of F Street. With just a few exceptions, there is no proof on the face of these checks that they are in satisfaction of any particular invoice, much less one of F Street's invoices. To date, I have located no support in Southern Foods' records that these checks were incorrectly applied to Southern Foods' accounts instead of F Street's old accounts receivable.

FURTHER AFFIANT SAYETH NOT.

_____
WALLACE NORWOOD

SWORN AND SUBSCRIBED BEFORE ME on this the 26th day of September, 2002, to certify which witness my hand and seal of office.

Debbra Schott
Notary Public, State of Texas
My Commission Expires
APRIL 22, 2004

_____
Notary Public In and For the State of Texas

My Commission Expires:
4-22-2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **F STREET INVESTMENTS, INC.** | § | |
| **A TEXAS CORPORATION F/K/A** | § | |
| **HYGEIA DAIRY COMPANY** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION B-02-001** |
| | § | |
| **SOUTHERN FOODS GROUP, L.P. AND** | § | |
| **SUIZA FOODS CORPORATION** | § | |

**AFFIDAVIT OF SCOTT McCLARREN**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF NUECES | § |

Scott McClarren, being duly sworn, states as follows:

1. My name is Scott McClarren.  I am the same Scott McClarren who provided an affidavit in this matter that is attached as Exhibit C to Defendants' Motion for Summary Judgment previously filed with this Court. I am over 18 years of age and am competent to make this Affidavit.  I have never been convicted of a felony.  I have personal knowledge of the facts stated in this Affidavit, and I know them to be true and correct.

2. I am the General Sales Manager of Southern Foods Group, L.P. d/b/a Hygeia Dairy ("Southern Foods"). I have been employed in this capacity since December of 1999. I previously worked for F Street Investments, Inc. ("F Street")[1] from March 1983 until November 1999. In my capacity as the Vice-President of Sales for F Street, I became familiar with F Street's accounting practices including the collection of accounts receivable.

3. Beginning in 1998, F Street became concerned that its then-existing

computer software system was not Y2K compatible.  To address this concern, F Street
began researching the possible implementation of a new software system.  F Street
acquired the "Descartes" computer software system in the fall of 1999.  There were
glitches and problems with this software from its initial installation.  Accordingly, F Street
had encountered problems that were attributable to this software.  On at least one
occasion, the software completely omitted the invoices of a customer from the first day
of the month.  F Street was not aware that this invoice was erased from the system until
the client notified F Street that it had received certain dairy products but had not
received a statement for the products.  In addition to the problems with this software, F
Street had a learning curve in the implementation of this software program as it was
different from the previous system.

4.     After Southern Foods' acquisition of F Street, I became a General Sales
Manager for Southern Foods.  In this capacity, I am aware of Southern Foods' effort to
attempt to collect F Street's old accounts receivable and remit any payments received
on behalf of F Street's old accounts to F Street.  Some of the difficulties in collection and
accounting were attributable to the numerous branches of F Street that Southern Foods
acquired as part of F Street's assets.  F Street had an ice cream manufacturing plant
located in McKinney, Texas and an ice cream distribution branch in Houston, Texas.  A
small two-person branch in San Antonio also distributed ice cream products.   In
addition, F Street had an ice cream and milk plant and distribution office located in
Corpus Christi, Texas and distribution branches in Laredo, McAllen, Harlingen, and
Brownsville, Texas.  As F Street served customers in these areas, some customers
would send the payments on their accounts receivable to these various locations.  After
Southern Foods ceased using the Descartes system sometime in February 2000, there

were other collection challenges as these checks needed to be sent to a single location where they could be entered into a general ledger account.

6.    I am the head of a sales staff and give instructions to sales representatives who work in my distribution area.  Part of the responsibilities of a sales representative is to collect any outstanding accounts receivable.    Collection responsibilities were part of the responsibilities of F Street's sales representatives and continue to be part of the responsibilities of Southern Foods' sales representatives. After Southern Foods' acquisition of F Street, I specifically instructed my sales staff that they were to continue collecting the pre-acquisition outstanding F Street accounts receivable.   These collection efforts typically involved placing phone calls to those customers that were delinquent in payment and also making personal visits to those customers.  Southern Foods' sales representatives used their best efforts to collect the pre-acquisition outstanding F Street accounts receivable.

7.    As a former Vice-President of F Street, I am familiar with F Street's record keeping process.   In particular, I am familiar with the records created by F Street to assist with the collection of accounts receivable.  F Street would regularly run a print-out of all of the aging accounts receivable for distribution to individuals involved in the collection process. I have reviewed the invoice lists that are attached as Exhibit C-1 and as part of Exhibit C-2 to Plaintiff's Motion for Partial Summary Judgment and Conditional Motion for Severance.  To the best of my knowledge, it was not in the regular course of business for F Street to create or record the information contained in Plaintiff's Exhibits C-1 and C-2.

FURTHER AFFIANT SAYETH NOT.

**SCOTT McCLARREN**

SUBSCRIBED AND SWORN TO BEFORE ME, and given under my hand and seal of office this 26th day of September, 2002.

Notary Public in and for
Said County and State
Nueces   Texas

My Commission Expires: July 24, 2004

JULIE S. MORALES
Notary Public, State of Texas
My Commission Expires
JULY 24, 2004

[1]During this time period, F Street operated as the Hygeia Dairy Company.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

F STREET INVESTMENTS, INC.　　§
A TEXAS CORPORATION F/K/A　　§
HYGEIA DAIRY COMPANY　　§
　　§
v.　　§　　CIVIL ACTION B-02-001
　　§
SOUTHERN FOODS GROUP, L.P. AND　　§
SUIZA FOODS CORPORATION　　§

## AFFIDAVIT OF KAY LYNN BRUMBAUGH

STATE OF TEXAS　　§
　　§
COUNTY OF DALLAS　　§

Kay Lynn Brumbaugh, being duly sworn, duly states as follows:

1.　　My name is Kay Lynn Brumbaugh. I am over eighteen years of age and have never been convicted of a felony. I am of sound mind and competent to testify regarding the matters stated herein which, based upon my own personal knowledge, are known to me to be true and correct.

2.　　I have been licensed to practice law in the State of Texas since 1992. I am a partner in the law firm Strasburger & Price, L.L.P., and I am one of the attorneys representing Defendants Southern Foods Group L.P. ("Southern Foods") and Suiza Foods Corporation (now Dean Foods Company) in this case.

3.　　Exhibit 1 attached hereto is a true and correct copy of relevant excerpts of Defendant Southern Foods Group, L.P.'s First Request for Production of Documents to Plaintiff which are dated April 29, 2002.



4.     On several occasions Defendants have requested, both orally and in writing, that counsel for F Street produce documents responsive to Defendants' previously served requests for production of documents.[1]   Exhibit 2 attached hereto is a true and correct copy of correspondence from counsel for Defendants to counsel for F Street, dated August 29, 2002, reiterating an oral request to review F Street's documents.

5.     Exhibit 3 attached hereto is relevant excerpts of the Joint Disclosure Statement (as modified) of Debtor, Cohyco, Inc., and the Official Committee of Unsecured Creditors for Joint Plan (as modified) of Debtor, Cohyco, Inc., and Official Committee of Unsecured Creditors for Reorganization of F Street Investments, Inc. F/K/A Hygeia Dairy Company as filed with the United States Bankruptcy Court For the Southern District of Texas, Brownsville Division, Case No. 00-20953-B-11 on September 4, 2002.

---

[1] In addition to Defendant Southern Foods Group, L.P.'s First Request for Production of Documents, attached hereto as Exhibit 1, Defendant Suiza Foods Corporation's First Requests for Production of Documents were also served on Plaintiff on April 29, 2002.

**AFFIDAVIT OF KAY LYNN BRUMBAUGH** - **Page 2**

FURTHER AFFIANT SAYETH NOT.

_____
KAY LYNN BRUMBAUGH

SUBSCRIBED AND SWORN TO BEFORE ME, and given under my hand and seal of office this 27th day of _September_____, 2002.

_____
Notary Public in and for
Said County and State

LEISA M. WHEELESS
Notary Public
STATE OF TEXAS
My Comm. Expires 02-28-2006

My Commission Expires:

___2-28-2006___

**AFFIDAVIT OF KAY LYNN BRUMBAUGH** - Page 3

763655.1/SP2/75935/0208/092502

01/29/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **F STREET INVESTMENTS, INC.,** | § | |
| **A TEXAS CORPORATION F/K/A** | § | |
| **HYGEIA DAIRY COMPANY** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. B-02-001** |
| | § | |
| **SOUTHERN FOODS GROUP, L.P.** | § | |
| **AND SUIZA FOODS CORPORATION** | § | |
| | § | |
| **Defendants.** | § | |

## DEFENDANT SOUTHERN FOODS GROUP, L.P.'S
## FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF

TO:    F STREET INVESTMENTS, INC., a Texas Corporation f/k/a Hygeia Dairy
Company, by and through its attorney of record, Nathaniel Peter Holzer, Jordan,
Hyden, Womble & Culbreth, P.C., 500 North Shoreline, Suite 900, Corpus Christi,
Texas 78471

Defendant Southern Foods Group, L.P. ("Southern Foods") serves the following

Requests for Production on plaintiff pursuant to Rule 34 of the Federal Rules of Civil

Procedure. Your responses shall be served upon defendants' attorneys of record Jerry L.

Beane and Kay Lynn Brumbaugh, Strasburger & Price, L.L.P., 901 Main Street, Suite

4300, Dallas, Texas 75202 and Eduardo R. Rodriguez and Alison Kennamer, Rodriguez,

Colvin & Chaney, 1201 East Van Buren, Brownsville, Texas 78522, prior to the expiration

of thirty (30) days after service of these Requests on your counsel of record.

## INSTRUCTIONS

1.    Defendant requests that plaintiff produce for inspection and copying by

defendant within thirty (30) days after service of this request at the offices of Strasburger



& Price, L.L.P., 901 Main Street, Suite 4300, Dallas, Texas 75202 each and all of the responsive documents.

2.    The documents produced in response to this request shall be segregated and clearly marked or labeled as to the specific request to which such documents are responsive and are being produced. Otherwise, such documents shall be produced as they are kept in the usual course of business, including the production of the files from which such documents are taken.

3.    If you do not answer any requests for production because of a claim of privilege, you must present your objections in accordance with the Rule 26(b)(5) of the Federal Rules of Civil Procedure.

## DEFINITIONS

As used in these requests, the following terms shall have the designated meanings:

1.    "You," Your," "Plaintiff," "F Street," and/or "Hygeia" means the plaintiff F Street Investments, Inc., a Texas corporation f/k/a Hygeia Dairy Company or any attorneys, agents, directors, officers, employees, representatives, distributors, subdistributors or investigators acting on behalf of the plaintiff with respect to any matter inquired about in these Requests for Production.

2.    "Defendant" or "Southern Foods" means Southern Foods Group, L.P. or its present directors, officers or employees.

3.    "Communicate" or "communication" means every manner or means of disclosure, transfer or exchange of information, whether orally or by document or whether face-to-face, by telephone, mail, facsimile, personal delivery, telecopy or otherwise.

4.    "**Document**" means any written, typewritten, handwritten, printed, recorded or computer generated material, as well as all tapes, disks, non-duplicated copies and transcripts thereof, email, or email backup now or at any time in your possession, custody or control; and without limiting the generality of the foregoing definition, but for the purposes of illustration only, **"document"** includes notes, correspondence, memoranda, business records, diaries, calendars, address and telephone records, photographs, tape recordings, computer disks, financial statements, records and trade publications.

Without limitation of the term "**control**" as used in the proceeding paragraph, a document is deemed to be in your control if you have the legal right to secure or obtain the document or a copy thereof from another person or public or private entity having actual possession thereof.

If any document was, but no longer is in your possession or subject to your control, state what disposition was made of it, the date or approximate date of the disposition, and why.

5.    Singular includes the plural and vice versa. The masculine includes the feminine and neuter genders. The past tense includes the present tense where the clear meaning is not distorted by change of tense.

6.    When used in the course of an enumeration of items as to which documents or information are requested, the words "and" and "or" are to be construed as requesting documents or information as to each item in the enumeration, the same as if the entire request had been addressed solely to that item.

7.    The terms "**referring**", "**reflecting**", "**relating**", and "**pertaining**" to any subject when used to specify or request any document, means any document,

communication or statement that constitutes, contains, embodies, evidences, reflects, identifies, states, discusses, defines, deals with, or is in any way pertinent to that subject.

8.    Unless specifically stated otherwise, the documents requested by this request for production are those which involve the time period from January 1, 1993 until the time of trial.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**    A copy of any and all asset purchase agreement(s) entered into between plaintiff and Southern Foods.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 2:**

A copy of any and all escrow agreement(s) entered into between plaintiff and Southern Foods.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 3:**

As referenced in Plaintiff's Original Petition paragraph 14, any and all of plaintiff's records reflecting or relating to the allegation that Southern collected but did not remit post-sale collections of plaintiff's pre-sale wholesale accounts receivable.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:**

As referenced in Plaintiff's Original Petition paragraph 14, any and all of plaintiff's records reflecting or relating to the allegation that you engaged in "careful analysis" which indicated that "Defendants collected but did not remit in excess of a quarter of a million dollars in post-sale collections of Plaintiff's pre-sale wholesale accounts receivable."

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:**

As referenced in Plaintiff's Original Petition paragraph 14, any and all of plaintiff's invoice itemizations of plaintiff's pre-sale wholesale accounts receivable.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:**

As referenced in Plaintiff's Original Petition paragraph 15, any and all documents reflecting or relating to Mr. Mario Castro's account balance due to plaintiff as of November 30, 1999.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:**

As referenced in Plaintiff's Original Petition paragraph 15, any and all documents reflecting or relating to the allegation that Southern Foods continued to supply Mr. Castro with milk

**REQUEST FOR PRODUCTION NO. 11:**

As referenced in Plaintiff's Original Petition paragraph 16, any and all documents reflecting a balance due to plaintiff for retail accounts receivable from plaintiff's retail milk delivery business.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:**

As referenced in Plaintiff's Original Petition paragraphs 16 and 30, any and all documents reflecting or relating to the allegation that Southern Foods refused to seek collection on the retail receivables on a commercially-reasonable basis.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:**

As referenced in Plaintiff's Original Petition paragraphs 17 and 34, any and all documents reflecting or relating to an alleged agreement between or representations made to plaintiff by Rick Beaman regarding repayment by Southern Foods of plaintiff's expenses for the 1999 Christmas parties.

**RESPONSE:**

DATED: April 29, 2002.

Respectfully submitted,

JERRY L. BEANE by KYB
Attorney-in-Charge
State Bar No. 01966000
Southern Dist. Bar No. 8993
KAY LYNN BRUMBAUGH
State Bar No. 00785152
Southern Dist. Bar No. 21341
STRASBURGER & PRICE L.L.P.
901 Main Street, Suite 4300
Dallas, Texas 75202
(214) 651-4300
(214) 651-4330 (Telecopier)

AND

EDUARDO R. RODRIGUEZ by KYB
State Bar No. 17144000
ALISON KENNAMER
State Bar No. 112804000
RODRIGUEZ, COLVIN & CHANEY
1201 East Van Buren
Brownsville, Texas 78522
(956) 542-7441
(956) 541-2170 (Telecopier)

**ATTORNEYS FOR DEFENDANTS SOUTHERN FOODS GROUP, L.P. AND SUIZA FOODS CORPORATION (NOW DEAN FOODS COMPANY)**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been forwarded to plaintiff's counsel of record via certified mail, return receipt requested on this the 29th day of April, 2002.

KAY LYNN BRUMBAUGH

DEFENDANT SOUTHERN FOODS GROUP, L.P.'S
FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF - Page 14
739000.1/SP2/75935/0208/04292002



# Strasburger
### ATTORNEYS AT LAW

August 29, 2002

JERRY L. BEANE
214.651.4521
Direct Fax: 214.659.4124
jerry.beane@strasburger.com

Nathaniel Peter Holzer
Jordan, Hyden, Womble & Culbreth, P.C.
500 North Shoreline Drive, Suite 900
Corpus Christi, Texas 78471

RE:   *F Street Investments, Inc. v. Southern Foods Group, et al*; Civil Action No. B-02-001; In the United States District Court for the Southern District of Texas, Brownsville Division

Dear Pete:

As I have mentioned previously, I want to take the depositions of Lee Richards and Doug Purl. Please give me some available dates for their depositions.

Also, as I have previously mentioned, I want to review the documents of F Street. Please let me know dates when those documents will be available.

Yours very truly,

Jerry L. Beane
vci

759613.1/SP2/75935/0208/08292002



Strasburger & Price, LLP

901 Main Street, Suite 4300 · Dallas, Texas 75202.3794 · 214.651.4300 tel · 214.651.4330 fax · www.strasburger.com
Austin · Dallas · Houston · San Antonio · Washington D.C. · Mexico City

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:

F STREET INVESTMENTS, INC.,
A TEXAS CORPORATION F/K/A
HYGEIA DAIRY COMPANY,

DEBTOR

CASE NO. 00-20953-B-11

CHAPTER 11

JOINT DISCLOSURE STATEMENT (as modified) OF DEBTOR, CORYCO, INC., AND THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS FOR JOINT PLAN (as modified) OF DEBTOR, CORYCO,
INC., AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR REORGANIZATION OF
F STREET INVESTMENTS, INC. F/K/A HYGEIA DAIRY COMPANY

Respectfully Submitted,

/s/
Doug Pahl, President,
F Street Investments, Inc.

/s/
Nathan J. Peter Holzer
State Bar No. 00793971
Admissions No. 21983
JORDAN, HYDEN, WOMBLE & CULBRETH, P.C.
500 N. Shoreline, Suite 900
Corpus Christi, Texas 78471
Telephone: 361-884-5678
Telecopier: 361-888-5353
ATTORNEYS FOR DEBTOR/
DEBTOR IN POSSESSION

/s/
Edward M. Lavin, Chairman
Official Committee of Unsecured Debtors

/s/
Rhett O. Campbell
State Bar No. 03714500
Randy W. Williams
State Bar No. 21566850
THOMPSON & KNIGHT, L.L.P.
1200 Smith Street, Suite 3600
Houston, Texas 77002
Telephone: 713-653-8600
Telecopier: 832-397-8245
ATTORNEYS FOR OFFICIAL COMMITTEE
OF UNSECURED CREDITORS

/s/
Lee Richards, Chairman
Coryco, Inc.

/s/
Ron Simank
State Bar No. 18359600
Admissions No. 5359
SCHAUER & SIMANK, P.C.
615 Upper N. Broadway, Suite 2000
Corpus Christi, Texas 78477
Telephone: 361-884-2800
Telecopier: 361-884-2823
ATTORNEYS FOR CORYCO, INC

September 4, 2002.

1. THE DISCLOSURE STATEMENT PROCESS. . . . . . . . . . . . . . . . . . 1
   1.1. Requirement to Vote on the Plan. . . . . . . . . . . . . . . . 1
       1.1.1. Filing A Proof Of Claim. . . . . . . . . . . . . . . . . 1
       1.1.2. Filing a Ballot Before the Deadline . . . . . . . . . . 1
   1.2. Representations Concerning the Debtor and the Plan . . . . . . 1
   1.3. Limitations on Certain Representation in This Disclosure Statement . . 1
   1.4. Number and Amount Of Votes Required . . . . . . . . . . . . . 2
   1.5. Solicitation . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.6. Committee Solicitation . . . . . . . . . . . . . . . . . . . . 2
2. VOTING CONSIDERATIONS. . . . . . . . . . . . . . . . . . . . . . . 3
   2.1. Statutory Requirements. . . . . . . . . . . . . . . . . . . . 3
   2.2. Non-Voting Classes . . . . . . . . . . . . . . . . . . . . . . 4
       2.3.1. — With Respect to a Secured Claim . . . . . . . . . . . 4
       2.3.2. — With Respect to an Unsecured Claim . . . . . . . . . 4
       2.3.3. — With Respect to a Claim of Equity Interests . . . . 5
   2.4. Court Determination . . . . . . . . . . . . . . . . . . . . . 5
3. HISTORY OF THE DEBTOR. . . . . . . . . . . . . . . . . . . . . . . 5
   3.1. HYGEIA DAIRY COMPANY. . . . . . . . . . . . . . . . . . . . . 5
       3.1.1. Ownership . . . . . . . . . . . . . . . . . . . . . . . 5
   3.2. MEXICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   3.3. 1995 - REFINANCING . . . . . . . . . . . . . . . . . . . . . . 6
   3.4. 1997 - CONGRESS FINANCING AND SUBORDINATION OF THE CORYCO
       NOTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   3.5. FINANCIAL PROBLEMS - "GOING CONCERN" QUALIFICATION . . . . . . 7
   3.6. YFK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   3.7. The Loan From Harlingen National Bank, Repayment, the Suit to Recover, and
       Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   3.8. SOUTHERN FOODS, L.L.C. . . . . . . . . . . . . . . . . . . . . 9
       3.8.1. Asset Sale . . . . . . . . . . . . . . . . . . . . . . . 10
       3.8.2. Post Sale Disputes and Litigation . . . . . . . . . . . 10
   3.9. QUALITY CHEKD . . . . . . . . . . . . . . . . . . . . . . . . 12
       3.9.1. Quality Chekd v. Coryco - Quality Chekd's attempt to Recover the Hygeia
           Account, Debt from Others . . . . . . . . . . . . . . . . 12
       3.9.2. F Street v. Quality Chekd - F Street's Lawsuit To Recover its Wrongfully
           Taken Property . . . . . . . . . . . . . . . . . . . . . . 14
       3.9.3. Objection to Claim . . . . . . . . . . . . . . . . . . . 14
       3.9.4. Global Mediation and subsequent Settlement between the Debtor, Coryco
           and the Committee, but not Quality Chekd . . . . . . . . . 16
       3.9.5. Factual Basis for Separate Classification of claim of Quality Chekd . 16
       3.9.6. POSITION STATEMENT OF QUALITY CHEKD . . . . . . . . . . 17
       3.9.7. PLAN PROPONENT'S RESPONSE TO POSITION STATEMENT OF
           QUALITY CHEKD . . . . . . . . . . . . . . . . . . . . . . 19
   3.10. GENERAL OUTLINE OF LITIGATION MATTERS . . . . . . . . . . . . 19
   3.11. F STREET'S ATTEMPTS TO NEGOTIATE A SETTLEMENT ARE
       BLOCKED BY QUALITY CHEKD . . . . . . . . . . . . . . . . . . . 25
   3.12. POST PETITION EVENTS . . . . . . . . . . . . . . . . . . . . 27
       3.12.1. Satisfaction of Legal Standard for Compromise and Settlement of
           Litigation . . . . . . . . . . . . . . . . . . . . . . . . 28
       3.12.2. Supplemental Bar Date and Notice by Publication . . . 29

Disclosure Statement for Plan of Reorganization of F Street Investments, Inc.
Page 1

4. GENERAL FINANCIAL CONDITION OF THE DEBTOR .................... 30
4.1. Debtor's Financial Condition at Petition Date ................... 30
4.2. Assets of Estate - Values ...................................... 30
4.3. Employer's General Insurance Group ............................ 30
4.4. Texas State Franchise Taxes for Year 2000 ..................... 30
4.5. Projected Financial Condition at Effective Date - Liquidation Analysis ... 31
4.6. Source of Information .......................................... 31
4.7. Disclaimer With Respect To Financial Information .............. 31
5. LIQUIDATION ALTERNATIVES AND ANALYSIS ........................ 31
5.1. General Discussion ............................................ 32
5.2. Alternative Plan of Reorganization ............................ 32
6. CHAPTER 11 PLAN PROVISIONS .................................... 32
6.1. SUMMARY OF THE PLAN .......................................... 33
6.1.1. Summary of Classes ......................................... 33
6.1.2. Summary of Plan Provisions ................................. 33
6.2. DEFINITIONS CONTAINED IN THE PLAN- Defined and Other Undefined .. 34
Terms ........................................................... 34
6.3. TREATMENT OF ALL CLAIMS ...................................... 35
6.4. OPTIONAL TREATMENT OF CLASS 5 CLAIM OF QUALITY CHECKD .......... 35
DAIRIES ......................................................... 35
6.5. OTHER IMPORTANT PLAN PROVISIONS .............................. 35
6.5.1. Unscheduled Creditors ...................................... 36
6.5.2. Disputed Claims ............................................ 36
6.5.3. Section 502(d) Bar To Voting and Distributions ............. 37
6.5.4. Transfer of Claims ......................................... 37
6.5.5. MEANS FOR EXECUTION OF THE PLAN ............................ 37
6.5.6. ACCEPTANCE OF THE PLAN AND BINDING EFFECT OF IMPAIRED ...... 37
DESIGNATION ..................................................... 37
6.5.7. PROVISIONS FOR REJECTION OR ASSUMPTION OF EXECUTORY ........ 37
CONTRACTS ....................................................... 37
6.5.8. NOTICES .................................................... 39
6.5.9. ALLOWANCE OF ATTORNEY'S FEES, COSTS AND EXPENSES ........... 39
6.5.10. Retention of General Claims and Settlement Rights of Claims . 40
6.5.11. DEFAULT UNDER THE PLAN ..................................... 41
6.5.12. MODIFICATION OF PLAN ....................................... 41
7. RISKS OF PLAN AND PERFORMANCE ................................ 41
8. LITIGATION IN NON-INSOLVENCY CONTEXT ......................... 41
9. OBJECTIONS TO CLAIMS ......................................... 41
10. CREDITORS COMMITTEE ......................................... 42
11. JURISDICTION RETAINED BY THE BANKRUPTCY COURT ............... 42
12. MISCELLANEOUS PROVISIONS .................................... 42
13. UNITED STATES TRUSTEE ....................................... 42
14. EXHIBITS TO THE DISCLOSURE STATEMENT ........................ 42
15. REQUEST FOR APPROVAL ........................................ 42

# JOINT DISCLOSURE STATEMENT [as modified] OF DEBTOR, COHYCO, INC., AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR JOINT PLAN [as modified] OF REORGANIZATION OF F STREET INVESTMENTS, INC. F/K/A HYGEIA DAIRY COMPANY

F Street Investments, Inc. f/k/a Hygeia Dairy Company (herein "Debtor"), as Debtor and Debtor in Possession and the proponent of the Joint Chapter 11 Plan of Reorganization, Cohyco, Inc., the Debtor's sole shareholder and the largest Creditor of the Debtor's estate ("Cohyco"); and the Official Committee of Unsecured Creditors (herein "Committee") as co-proponents of the Joint Chapter 11 Plan of Reorganization [as modified], hereby file this Joint Disclosure Statement [as modified] ("Disclosure Statement") pursuant to the Joint Plan of Reorganization [as modified] ("Plan") for Debtor attached hereto as Exhibit "1", pursuant to the requirement of the United States Bankruptcy Code, 11 U.S.C. § 101, et. seq. and pursuant to 11 U.S.C. § 1125 for consideration by Creditors and other Parties in Interest as follows:

## I. THE DISCLOSURE STATEMENT PROCESS

The Plan was filed with the United States Bankruptcy Court (herein the "Court," as defined in the Plan) on June 7, 2002, and was modified on September 4, 2002. This Disclosure Statement was filed on June 7, 2002 and modified on September 4, 2002. A hearing for approval of the Disclosure Statement was scheduled for August 13, 2002, at which time it was announce that only objection, that Quality Check Dairies received, the modification. This Disclosure Statement is being furnished to all Creditors and parties in interest of the Debtor under his Chapter 11 proceedings.

The Bankruptcy Code (Title 11 U.S.C. § 101, et seq.) requires that "adequate information" be furnished all Creditors or parties in interest, consisting of a full and adequate disclosure by the Debtor in Possession of his historical, current and anticipated future financial and business affairs, so that Creditors and other parties in interest can make an informed decision concerning any vote they may cast either in favor of, or in opposition to, any proposed Plan.

**THE OBJECTION PROCESS IS A PRE-CONDITION TO YOUR RELIANCE ON THIS DISCLOSURE STATEMENT**

THIS DISCLOSURE STATEMENT HAS BEEN PRESENTED TO THE BANKRUPTCY COURT FOR APPROVAL AS CONTAINING "ADEQUATE INFORMATION" AS REQUIRED UNDER THE BANKRUPTCY CODE. SUCH APPROVAL IS REQUIRED BY STATUTE AND DOES NOT CONSTITUTE A JUDGMENT BY THE COURT AS TO THE DESIRABILITY OF THE PLAN OR AS TO THE VALUE OR SUITABILITY OF ANY CONSIDERATION OFFERED THEREBY. THE FINAL APPROVAL OF THIS DISCLOSURE STATEMENT WILL BE GRANTED BY THE BANKRUPTCY COURT ONLY AFTER i) YOU HAVE RECEIVED NOTICE OF ITS FILING AND HAVE BEEN GIVEN AN OPPORTUNITY TO BE HEARD, AND ii) YOU DO NOT OBJECT ON THE BASIS OF ABSENCE OF "ADEQUATE INFORMATION" AND SUSTAIN YOUR

## 3.8. SOUTHERN FOODS, L.L.C.

### 3.8.1. Asset Sale

As early as 1993, Hygeia's chairman Lee Richards had determined that there was not a long-term future for Hygeia as an independent dairy company. Richards foresaw the consolidation that was likely to take place in the industry and as a result began consideration of selling the company. In 1993 Hygeia hired Strategic Capital to market the company, and in the spring of 1994 Strategic Capital was soliciting buyers for the company. The only offer made was by Southern Foods, of $9,000,000 for only a portion of the company. However, at about that same time the pass was rejected and Southern reduced its offer to $4,500,000, which offer was then rejected. Strategic quit trying to market Hygeia in May of 1995.

On December 6, 1997, Mr. Richards discussed with Southern Foods a possible sale of the Company for $17,000,000.

In 1998, Hygeia sought the assistance of Deloitte Touche in selling the company, and obtained a valuation analysis for the company that indicated a valuation range. From $14,000,000 to $18,000,000. At the same time, Hygeia also had Deloitte Touche conduct an analysis of tax implications for various structures of a potential sale of the company.

In mid-November, 1999, Southern made F Street a final offer of $9,000,000 for virtually all its operating assets. By that time F Street had no real intention but to accept, as absent a sale the business would likely have to close within the next few months, in which case the assets would have been liquidated for far less than the Southern offer. There were no other offers or bidders.

### 3.8.2. Post Sale Disputes and Litigation With Southern / Suiza

F Street has filed suit against Southern Foods and its parent Suiza Foods Corporation, n/k/a Dean Foods Company, for predatory business practices, anticompetitive practices, breach of contract, and conversion. The lawsuit is pending in Federal District Court in the Brownsville Division of the Southern District of Texas.

As part of the Sale Agreement to Southern Foods, an escrow account was created at Chase Bank. The escrow account at Chase Bank contain $500,000.00 plus accrued interest, subject to the Escrow Agreement dated November 30, 1999. According to section 3(d) of the Escrow Agreement, Southern Foods was to have released $400,000.00 to F Street on March 29, 2000, less any unresolved indemnity claims owed to Southern Foods as provided for by the APA, and the

remaining $100,000.00 in December 2000.

Southern Foods has breached its contract with F Street by, among other things, refusing to honor the terms of the Escrow Agreement. These and other unresolved issues are as follows:

1. **Indemnification.** F Street generally agrees that Southern is entitled to indemnity for the November 1999 payroll of $67,163.62 and $2,413.80 related to F Street's pre-sale lease payments that were due to Raymond. In addition, indemnity is owed for expenses incurred by Southern in the defense of the Moreno and Gonzales cases, subject to challenge as to the amount. Southern claims its litigation expenses are $26,149.15. Southern also claims an additional amount of indemnity due of $23,929.28 for various items that F Street disputes. Thus the Debtor's liquidated indemnity obligation is $49,577.42 and its maximum exposure is $119,655.85.

2. **Preference.** Southern Foods received a preference of $134,071.20 resulting from F Street's payment to Southern Foods on January 24, 2000, for pre-sale property taxes Southern Foods paid to effect the closing of the sale. However, any recovery on the preference would be included in F Street's indemnity obligation for pre-sale taxes under the APA, assuming the continued existence of that obligation the Debtor has determined not to pursue the preference.

3. **Accounts Receivable.** There are three separate and discrete issues concerning accounts receivable.

3a. **Wholesale Accounts Receivable.** Southern actually collected a number of F Street's accounts receivable that did not remit the proceeds. F Street's records show that as of May 1, 2002, Southern had collected but did not remit the sum of $362,247.50 in post sale collections of F Street's pre-sale wholesale accounts receivable.

3b. **Mario Castro.** Mario Castro was a wholesale milk customer of F Street in San Antonio who does business as Castro School Milk. Mr. Castro's account balance (adjusted to include all credits due) was $121,800.27 on November 30, 1999. After that date Southern Foods continued to supply Castro with milk and other products and collected its new invoices without requiring Castro to pay F Street's older invoices. As a result, F Street had to sue Castro to collect and has obtained a judgment for $121,800.27 plus $12,800.00 in attorney fees, plus costs, with interest on the unpaid balance at 10% per annum. F Street has collected part but not all of the judgment via voluntary payments and post-judgment executions. Further collection efforts are underway. It was commercially unreasonable for Southern Foods to continue doing business and extending credit to Castro without requiring payment of F Street's older invoices. Southern has submitted an indemnity deposition testimony. As such, Southern breached the APA with regard to Castro. F Street therefore demanded payment from Southern Foods of the remaining amount owed by Castro on the judgment, plus all its costs of collection. Upon such payment F Street will provide Southern all its rights against Castro.