*14*

United States District Court
Southern District of Texas
ENTERED

APR 0 1 2003

Michael N. Milby, Clerk of Court
By Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

F STREET INVESTMENTS, INC. F/K/A        §
HYGEIA DAIRY COMPANY,                    §
      **Plaintiff**                      §
                                         §
v.                                       §     **CIVIL CASE NO. B-02-001**
                                         §
DEAN FOODS, COMPANY F/K/A/               §
SUIZA FOODS CORPORATION, AND             §
SOUTHERN FOODS GROUP, L.P.               §
      **Defendants.**                    §

## ORDER

    BE IT REMEMBERED, that on March 31, 2003, the Court considered Plaintiff's Motion for Partial Summary Judgment [Dkt. No. 9], Defendants' Motion for Summary Judgment [Dkt. No. 10] and the responses and reply thereto [Dkt. Nos. 12, 13 & 14]. The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment and **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment.

I.

### Procedural and Factual Background

    Many of the facts in this case are not disputed. Plaintiff alleges Defendants violated federal and state antitrust laws, committed breaches of contract, and committed conversion under state tort law. Plaintiff F Street was a producer and distributor of dairy products in the Rio Grande Valley ("the Valley") and was headquartered in Harlingen, Texas. See Pl's Pet. at ¶ 6. Defendant Southern Foods owns dairy processing plants where it processes raw milk and distributes dairy products to customers in the Valley. Southern Foods does business under the assumed name of Oak Farms Dairy ("Oak Farms"), and Southern Foods introduced Oak Farm dairy products in the Valley during the 1990s. Southern Foods and F Street were competitors in this area. See id. In 1993 F Street began seeking purchasers for the dairy production company. See id. ¶ 7. On November 30, 1999, F Street sold most of its operating assets to Southern Foods for $9,113,000 (nine million one hundred thirteen thousand dollars). Hygeia Dairy Company was F Street's predecessor,

1

and the name was part of the acquisition. After the acquisition, Plaintiff began to use the name F Street Investments, Inc. The parties agree they entered into an Asset Purchase Agreement and a related Escrow Agreement, which governed the sale of F Street. See Pl's Motion for Partial Summary Judgment (hereinafter "Pl's Mot."), Exs. A & B [Dkt. No. 9]; Defs' Motion for Summary Judgment (hereinafter "Defs' Mot."), Exs. F1 & F2 [Dkt. No. 10]. These agreements defined the contractual rights of the parties.

On December 31, 1999, Suiza Foods Corporation, now Dean, acquired Southern Foods. Southern Foods continues to produce and distribute Oak Farms dairy products in Texas. Suiza Foods did not produce or distribute dairy products in the Valley at any time relevant to this lawsuit, nor was it involved in pricing decisions related to dairy products sold by Southern Foods in the Valley. See Defs' Mot., at p. 12, Ex. A, at p. 5, ¶ 12 (Affidavit of Michael A. Bell, Group Vice President of Southern Foods).

II.

### Summary Judgment Standard

Summary Judgment shall be granted if the record, taken as a whole, "together with affidavits, if any, show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual controversies, if any exist, are resolved in favor of the nonmoving party. See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). See also Hunt v. Cromartie, 526 U.S. 541, 552 (1999). The party making a summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery documents that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Colson v. Grohman, 174 F.3d 498, 506 (5th Cir.1999). Although the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," Celotex Corp., 477 U.S. at 327, the party "need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (citing Celotex, 477 U.S. at 323). If the moving party meets this burden, the non-movant then must designate specific facts, beyond the pleadings, showing there is a genuine issue for trial to survive summary judgment. See Fed. R. Civ. P. 56(e). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). See also Little, 37 F.3d at 1071 (citing Celotex, 477 U.S. at 325).

"Unsubstantiated assertions" will not adequately cast doubt on material facts at issue. See Hopper v. Frank, 16 F.3d 92 (5th Cir. 1994). Likewise, the nonmovant must present more than a mere "scintilla" of evidence. See Davis v. Chevron U.S.A., Inc., 14 F.3d 1082 (5th Cir. 1994). Summary Judgment should be granted "when the nonmoving party fails to meet its burden to come forward with facts and law demonstrating a basis for recovery that would support a jury verdict." Little, 37 F.3d at 1071. The evidence must be viewed in the light most favorable to the nonmovant. See Whelan v. Winchester Prod. Co., 319 F.3d 225, 228 (5th Cir. 2003); Walker v. Thompson, 214 F.3d 615, 624 (5th Cir. 2000). In this case both parties have submitted motions for summary judgment on the contract and conversion claims. Only Defendants, however, have submitted a motion for summary judgment on the antitrust claims.

III.

## Breach of Contract – Asset Purchase Agreement

Plaintiff alleges Defendants paid to Plaintiffs a large portion of the receivables they collected but failed to remit $230,317.43 of collected funds. Plaintiff sues to recover these funds under a breach of contract theory and for conversion resulting from Defendants' allegedly wrongful exercise of dominion and control over the funds, which Plaintiff alleges constitutes its property.

Defendants contend they complied with the Asset Purchase Agreement at all times. More specifically, they argue they exercised good faith in attempting to determine if F Street was entitled to accounts receivable submitted by customers who did not specify the invoice number or date with their payments. Defendants have demonstrated the absence of evidence supporting Plaintiff's claim and as such have proven Plaintiff's claim for breach of contract of the Asset Purchase Agreement should be rejected as a matter of law.

The summary judgment evidence, included as exhibits by both parties includes paragraph 12.14 of the Asset Purchase Agreemen, which states:

[Southern Foods] agrees to attempt to collect the Accounts Receivable on behalf of [F Street] on a commercially reasonable basis and forward the proceeds of its collection efforts to [F Street] within five business days following the receipt by [Southern Foods]. Payments received by [Southern] which apply to both

3

> [Southern Foods's] and [F Street's] accounts receivable shall be paid to [F
> Street] in the amount equal to the portion of the payment attributed to the
> Accounts Receivable of [F Street]. If payment is received by [Southern Foods]
> and the customer fails to specify whether the invoice or invoices being paid by
> the customer apply to [F Street's] Accounts Receivable or [Southern Foods]
> Accounts Receivable, the parties agree to work together in good faith to
> determine how payment should be applied between them. Any Accounts
> Receivable that remain uncollected as of one hundred twenty (120) days
> following the Closing Date [November 30, 1999], shall become the sole
> responsibility of [F Street] and [Southern Foods] shall have no obligation to take
> any further action with respect to the Accounts Receivable.

See Pl's Mot., at Ex. A. It is uncontroverted that after Southern Foods purchased F
Street, pursuant to the Asset Purchase Agreement, Southern Foods was obligated for
120 days after the sale of F Street to attempt to collect F Street's old accounts
receivable.

Plaintiff admits that Southern Foods collected and forwarded to F Street a total of
$5,074,579.78. See Pl's Mot., at Ex. C, ¶ 12. Plaintiff admits that of the alleged total
Defendants collected and did not remit, F Street did receive several payments of
accounts receivable --$ 44,598.52 on November 27, 2000 and another payment of
$31,930.07 on May 24, 2002. See id. at p. 5, ¶ 9. Plaintiff unsuccessfully attempts to
create a fact issue when it alleges Southern Foods collected an additional $230,317.43
that was never remitted to F Street, but presents no competent summary judgment
evidence to support such allegation.

The evidence presented to support F Street's contention that Defendants
collected and then withheld $230,317.43 of accounts receivable is not competent
summary judgment evidence because it does not fall into the Business Records
Exception of Federal Rule of Evidence 803(6). Records such as those presented by
Plaintiff may be admitted as an exception to the hearsay rule if they are "[a]
memorandum, report, record, or data compilation, in any form, of acts, events,
conditions, opinions, or diagnoses, made at or near the time by, or from information
transmitted by, a person with knowledge, if kept in the course of a regularly conducted

4

business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness." Fed. R. Evid. 803(6). Indeed, the admissibility of evidence under Rule 803(6) is "chiefly a matter of trustworthiness." United States v. Wells, 262 F.3d 455, 459 (5th Cir. 2001) (quoting Mississippi River Grain Elevator, Inc. v. Bartlett & Co., 659 F.2d 1314, 1319 (5th Cir. 1981)).

Plaintiff calculates the alleged amount of account receivables it is owed in several ways. Plaintiff analyzed its records of unpaid accounts on November 30, 1999, by invoice and spoke with individual customers to determine the invoices had been paid. F Street submitted the affidavit of Doug Purl, the President of F Street and custodian of records. See Pl's Motion for Summary Judgment, at Ex. C, ¶ 6. Mr. Purl refers to a spread sheet, attached as an exhibit to his affidavit, which is entitled "Open Invoices –Customer Says Have Been Paid." Id. at Ex. C1. The spread sheet lists an account name, account number, invoice number, invoice date, invoice amount, check number, and check date. Mr. Purl calls this spread sheet a "business record" and states these records were kept in the regular course of business. Nonetheless, Plaintiff's brief describes this spread sheet as if it were made in an effort to prepare for litigation and to trace those accounts receivable that Defendants allegedly collected but failed to remit to Plaintiffs. That this data sheet was not kept in the normal course of business is evidenced by the fact that it is a list of "open invoices," compiled from other records, combined with information collected from customers concerning whether they had paid Southern Foods and closed the invoice. Namely, representatives of F Street phoned individual customers with open invoices on the date of the sale, and inquired as to whether they had in fact paid their accounts to Southern Foods. Plaintiff has not submitted the business records of all open invoices on the sale date or a records in the form of a monthly report of remitted payments from Southern Foods with a comparison of those invoices that remain open. Stated differently, had F Street not spoken with these customers, this data sheet could not have been created. Thus, this data appears to have been compiled outside the normal means for maintaining business records.

Additionally, Plaintiff attaches a list and copies of checks they obtained from customers for which customers told representatives of F Street they made payment to

Oak Farms on invoices with dates prior to the sale of F Street. See Pl's Motion for Summary Judgment, at Ex. C2. Most of the checks themselves do not indicate an invoice number or an invoice date. This data list too is a compilation of conversations representatives of F Street had with customers in an attempt to match cancelled checks with outstanding invoices on accounts receivable that were dated prior to the sale. A review of most of the checks does not reveal whether the payments were made for sales conducted prior to the purchase of F Street, in which case F Street would be entitled to the account receivable, or whether the payments were made on sales conducted subsequent to the purchase of F Street, in which case Southern Foods would be entitled to the account receivable. See id. at Ex. C2. Indeed, many of the checks in the record were submitted with fax sheets indicating the check was faxed by the customer to F Street on a date many months after the date on the check. These checks, therefore, were not copies of cancelled checks retained at the time the customer submitted payment to Southern Foods for F Street's old accounts receivable.

In short, Mr. Purl states these records were kept in the normal course of business and that those with knowledge of the events and circumstances made the records. Despite his terse conclusion, the first spread sheet contains information regarding only those accounts receivable that Plaintiff alleges were paid to Defendants and not remitted. Plaintiff does not submit a report of those accounts receivable payments it admits Southern Foods remitted, nor does Plaintiff submit a kind of monthly activity report or other documentation that is regularly made to trace payments of accounts receivable remitted by Southern Foods. In fact, Plaintiff does not even include spread sheets documenting the outstanding balance due on all of F Streets accounts receivable on November 30, 1999, the date of the sale, or any records demonstrating Southern Foods remitted $5,074,579.78 of the total amount of accounts receivable due on November 30, 1999. Instead, Plaintiff attempts to trace its calculations by submitting the affidavit of Mr. Purl, in which he provides conclusory statements concerning bottom-line numbers of comparison such as the amount of accounts receivable due at the time of the sale, the amount remitted by Southern Foods, and the amounts of reductions F Street applied to the total of accounts receivable due. For example, Mr. Purl states "since [November 30, 1999], the amount

6

of the Sale Date Receivables Balance has been further reduced by F Street's writing off of $2,574,539.56 of its Accounts Receivable." Pl's Motion for Summary Judgment, at Ex. C, ¶ 13. Plaintiff does not, however, explain why it wrote off that amount. These numbers, therefore, are final conclusions without supporting documentation. In addition, the records that were submitted largely resulted from conversations F Street had with customers, and the records were compiled in an effort to catalogue those collections that Defendants allegedly failed to remit. The records, therefore, resulted from the investigation F Street conducted to support its contention that Southern Foods had failed to remit $230,317.43. The generation of these records calls into question their trustworthiness. As a result, the records are not competent Summary Judgment evidence. See Leonard v. Dixie Well Serv. & Supply, Inc., 828 F.2d 291, 295 (5th Cir. 1987) (providing examples of conclusory statements that were incompetent evidence under Rule 56); Broadway v. City of Montgomery, 530 F.2d 657, 660 (5th Cir. 1976) (explaining that affidavits with a recital of unsupported allegations and conclusory statements is not sufficient evidence to avoid summary judgment, and stating evidence inadmissible at trail cannot be used to avoid summary judgment).

Plaintiff cites several other methods for calculating the amount of accounts receivable allegedly owed them by Defendants. F Street took the outstanding balance due on its accounts receivable as of the date of the sale, reduced this total by the amount they allege Defendants actually paid them, applied other reductions, credits, and offsets, and reached a number that was close to $230,317.43. As discussed, however, these totals are conclusory statements provided in an affidavit and are not supported by records. Finally, Plaintiff attempts to support the amount allegedly owed to it by comparing Southern Foods's responses to interrogatories in which it denied having received payment for a number of invoices and copies of cancelled checks by customers. F Street suggests these cancelled checks provide proof that Southern collected $74,665.26, for which Southern Foods denied it received payment. Again, however, many of the checks do not indicate an invoice number or invoice date. The checks do not indicate, therefore, whether they should be applied to F Street or to Southern Foods. Additionally, many of the checks were faxed by the customers months or years after the dates documented on the checks. These cancelled checks,

7

which in part served as the basis for the spread sheets attached to Plaintiff's Motion for Summary Judgment, were not kept in the normal course of business, but were collected from customers after Plaintiff alleged Defendants had not remitted certain accounts receivable.[1] These checks, therefore do not provide evidence that Defendants withheld money they collected for F Street's old accounts receivable.

Finally, Plaintiff's original petition alleges that Southern Foods failed to collect wholesale accounts receivable from Mario Castro, a wholesale milk customer, after the sale of F Street. See Pl's Original Petition, at ¶¶ 30-31 [Dkt. No. 1]. Plaintiff, however, does not argue this point in its Motion for Partial Summary Judgment, and instead argues Southern Foods owes a total of $230,317.43 for accounts receivable it collected but not remit. Nor does Plaintiff argue in the motion that Defendants breached the agreement by failing to make proper or good faith attempts to collect money due on the Castro account. Indeed, Defendants have presented competent evidence in the form of an affidavit that they made attempts to collect payment from Castro, but to no avail. See Defs' Mot., at p. 10; Ex. E, at 3-4, ¶¶ 8-9. Plaintiff has not presented evidence demonstrating Defendants did not make attempts to collect the accounts receivable and thus it has not demonstrated a material issue of fact exists on this claim.

Similarly, Plaintiff alleges in its original petition, but not in its Motion for Summary Judgment, that a portion of the accounts receivable claim is based on Southern Foods's alleged failure to collect F Street's retail accounts receivable. The retail accounts receivable concerned retail milk delivery routes to individuals who used the WIC (Federal Women, Infants & Children Program) card or the Lone Star card as payment. Plaintiff asserts that Southern Foods did not collect the balance due on these accounts when it shut down these routes on December 7, 1999. See Pl's Original Petition, at ¶ 16. In addition, Plaintiff alleges in the petition that Defendants refused to seek collection on the retail receivables on a commercially reasonable basis during the 120-

---

[1] Defendants represent to the Court that they never received a list of these checks from Plaintiff until they were served with Plaintiff's Motion for Summary Judgment. This again calls into question the trustworthiness of Plaintiff's evidence concerning at least $74,665.26 of the accounts receivable Plaintiff allegedly did not receive.

day period in which they were obligated to do so under the Asset Purchase Agreement. See id.

The points mentioned above were again not raised in Plaintiff's Motion for Summary Judgment. Defendants have provided some evidence that they in fact attempted to collect on these accounts despite the termination of the milk routes in December 1999. See Defs' Mot., at p. 11, Exs. D, at 5, ¶ 10; E, at 4, ¶ 10. Although the reason for the immediate termination of the program is uncertain because the letter attachment from the Texas Department of Health states that those programs already authorized could continue through September, 2000, Defendants have presented evidence that they made attempts to continue collection of F Street's old accounts even after the program ended. Because Plaintiff does not provide any evidence, in the form of affidavits or otherwise, that Defendants did not make attempts to collect the retail accounts even after the program terminated, Plaintiff cannot simply rely on conclusory allegations in its pleadings. See Whelan v. Winchester Prod. Co., 319 F.3d 225, 228 (5th Cir. 2003). See also Pl's Original Petition, at ¶ 16. Instead, Plaintiff argues in its response to Defendants' Motion for Summary Judgment that Jimmy Wallace's affidavit was insufficient to demonstrate actual attempts were made to collect accounts receivables. The Court disagrees. Jimmy Wallace, a branch manager of Southern Foods's Oak Farms-McAllen branch office, stated that after the delivery routes were to be shut down, "[he] instructed the delivery route drivers to continue their efforts to attempt to collect on any outstanding account receivables that were due F Street." Defs' Mot., Ex. D, at 5, ¶ 10. Plaintiff did not present any countervailing evidence demonstrating a fact issue exists concerning whether efforts were made to collect accounts receivables due to F Street.

In conclusion, Plaintiff has failed to present competent summary judgment evidence that supports its claim that Defendants breached the Asset Purchase Agreement by failing to remit $230,317.43 to F Street. Defendants, conversely, have made a convincing showing that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. Plaintiff has failed to come forward with necessary countervailing evidence to defeat summary judgment. As a result, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendants' Motion for

Summary Judgment on the breach of contract claim concerning the Asset Purchase Agreement.

IV.

Breach of Contract - Funds in Escrow

Article IV of the Asset Purchase Agreement required that $1,000,000 (one million dollars) of the purchase price be deposited into an Escrow account and held and distributed in accordance with the Escrow Agreement.  The Escrow Agreement was intended to protect Southern Foods from unknown inventory and indemnity claims related to F Street that could arise after the date of sale.

Paragraph 3(a) of the Escrow Agreement states:

Five Hundred Thousand Dollars ($500,000) of the Escrow Money can be used (i) to satisfy indemnity Claims pursuant to Article XI of the Asset Purchase Agreement and (ii)  to satisfy any deficiency payments owed by F Street to Southern Foods pursuant to Section 4.2 of the Asset Purchase Agreement relating to the value of F Street's inventory (an 'inventory claim') and Five Hundred Thousand Dollars ($500,000) of the Escrow Money can be used (A) to satisfy any environmental remediation costs and expenses pursuant to Section 8.3 of the Asset Purchase  Agreement which is estimated as a result of the environmental testing performed by Southern Foods pursuant to the Asset Purchase Agreement that Southern Foods will be required to incur in connection with real property purchased from F Street pursuant to the Asset Purchase Agreement ('Environmental Claims') and (B) to satisfy Inventory Claims.

See Pl's Mot., at Ex. B.

Paragraph 3(d) of the Escrow Agreement states:

Five Hundred Thousand Dollars ($500,000) of the Escrow Money will be held by Escrow agent for a period of 120 calendar days from the date of this Agreement and will be available to satisfy Indemnity Claims and Inventory Claims.  Upon the expiration of such 120 calendar day period, the Escrow Agent will distribute to [F Street] the sum of Four Hundred Thousand Dollars ($400,000) less the amount of any Indemnity Claims or Inventory Claims that have been received by Escrow Agent . . . . One Hundred Thousand Dollars ($100,000) of the Escrow Money will

> continue to be held by Escrow Agent to satisfy Indemnity Claims until the first
> anniversary of the date of this Agreement, at which time Escrow Agent will
> distribute the balance of the Escrow Money to [F Street] less the amount of any
> Indemnity Claims that have been received by Escrow Agent.

See id. at Ex. B.

F Street claims Defendants breached the Escrow Agreement because they allegedly have failed to release $370,000.00 from the Escrow Account. See Pl's Mot., at p. 8. Plaintiff admits that $70,327.42 of the escrowed funds is subject to Defendants' indemnity claims. See id. Plaintiff further asserts that the disputed indemnity claims total $49,328.43. Plaintiff's admitted amount of indemnity claims plus the disputed amount equals $119,655.85, which is the amount Defendants claim they are entitled to in indemnity claims. Defendants additionally claim they are entitled to amounts that may be incurred in the future in the defense of the Moreno v. Hygeia Dairy Company, et al., lawsuit. See id., at Ex. M, p. 3; Defs' Mot., at Ex. B1. Plaintiff argues Defendants have never provided it with any documentation concerning the amount of their indemnity claims arising from their defense of the Moreno and Gonzalez v. Hygeia Dairy Company lawsuits.[2] See id. at p. 8.

Plaintiff states, "[t]here is substantial evidence regarding [F Street's] current entitlement to $370,000 (plus related interest) out of the Escrow Account. [Exhibits B,D,E,J, and M]." Pl's Response to Defendants' Mot., at p. 19 [Dkt. No. 13]. None of the exhibits Plaintiff cites, however, demonstrate it is entitled to $370,000 from the Escrow Account. Exhibit B is simply a copy of the Escrow Agreement itself. See Pl's Motion for Summary Judgment, at Ex. B. Exhibit D is a September 15, 2000, letter from F Street to Southern Foods in which F Street asserts a claim of $311,791.54 of the Escrow funds and notes that Southern Foods has an indemnity claim of $88,208.46. See id. at Ex. D. Exhibit E is a September 15, 2000, letter from F Street to the Escrow Agent at Chase Bank requesting that the agent distribute $311,839.54 to F Street plus

---

[2] Defendants assert that as of July 18, 2002, Southern Foods had incurred fees and expenses in the Moreno lawsuit for $14,629.99 and $11,519.15 in Gonzalez. According to Defendants the Moreno lawsuit was still pending at that time. See Defs' Motion for Summary Judgment, at Ex. G, at p. 2, ¶¶ 2-3.

interest. This letter was attached to F Street's September 15, 2000, letter, which requested Southern Foods's approval of the disbursement request. See id. at Ex. E. Furthermore, it is unclear why Plaintiff references $311,791.54 in the first letter, but requests a disbursement of $48.00 more from the Escrow Agent. Exhibit J is an October 5, 2000, letter from F Street to Southern Foods in which it demanded Southern Foods send a letter to the Escrow Agent authorizing the release of $305,743.30 plus interest to F Street, while $94,256.70 could "arguably" be withheld from the Escrow Account. See id. at Ex. J. Finally, Exhibit M is a May 10, 2002, letter from Southern Foods to F Street in which Southern Foods agreed to the release of $355,344.15 to F Street and $96,476.57 to Southern Foods, leaving $48,179.28 and accrued interest remaining in the Escrow Account to cover future expenses that Southern Foods may incur in connection with its defense of the Moreno lawsuit and any other disputed claims. See id. at Ex. M. None of these letters demonstrate that Plaintiff is entitled to a total amount of $370,000 from the Escrow Account or that Defendants have failed to release funds from the escrow account. Rather, the undisputed evidence shows Defendants have made at least two attempts to release funds from the escrow account, albeit in an amount that is approximately $15,000 less than the amount now requested by Plaintiff.

Defendants argue that Plaintiff has refused at each turn to agree to the disbursement of funds from the Escrow Account. Indeed, the record contains one letter, dated March 9, 2001, in which F Street notified Southern Foods that it rejected a proposal of distribution made by Southern Foods. See Pl's Mot., at Ex. L. This March 9 letter also references F Street's October 5, 2000, letter in which F Street demanded the release of $305,743.30. Additionally, because the funds remain in the escrow account, F Street apparently also rejected Southern Foods's May 10, 2002, offer to release $355,344.15 to F Street from the Escrow Account. Frankly, the only reason the Court can glean for such a refusal is F Street's claim that Southern Foods has improperly withheld funds from F Street's old Accounts Receivable, and as a result, F Street is entitled to an off set and does not owe Southern Foods any of the Escrow funds for Southern Foods's claims of indemnity. See Pl's Mot., at p. 10 [Dkt. No. 9]. Because the Court has already ruled Plaintiff failed to demonstrate a breach of contract

claim for the Accounts Receivable, there is no need for it to reach Plaintiff's assertion for an off set.

In short, Plaintiff has failed to demonstrate that it is entitled to $370,000 of the Escrow funds. Based on the evidence submitted by Plaintiff, it appears Defendants have made at least one attempt to release approximately $355,000 to F Street. Additionally, at least one other attempt to authorize the release of funds by Southern Foods is referenced in correspondence sent from F Street to Southern Foods. Although the Court now concludes that Plaintiff has failed to present evidence demonstrating that Defendants breached the Escrow Agreement, it by no means concludes that Plaintiff is not entitled to a portion of the Escrow funds or that Defendants are not entitled to a portion of the funds for their indemnity claims. Indeed, the parties appear to agree that Plaintiff is at least entitled to $355,344.15, which is the amount Southern Foods last offered to release from the escrow account in its May 10, 2002, letter. Futher, the parties agree Southern Foods is at least entitled to $70,327.42 for its indemnity claims. The parties have not, however, submitted evidence to determine the proper distribution of the disputed funds, and indeed they have not requested the Court to make such a determination. The Court, therefore, limits its determination to a finding that Plaintiff has not demonstrated that Defendants breached their duties under the Escrow Agreement by failing to agree to the release of funds. As a result, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendants' Motion for Summary Judgment on the breach of contract claim concerning the Escrow Agreement.

V.

Reimbursement Claim - Christmas Party Expenses

The elements of written and oral contracts are the same and must be present for a contract to be binding. These elements are: "(1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." Wal-Mart Stores, Inc. v. Lopez, 93 S.W.3d 548, 555-56 (Tex. App. – Houston [14th dist.] 2002, no pet) (citations omitted). The elements of a breach of contract are: "(1) the existence of a valid contract between plaintiff and defendant, (2)

the plaintiff's performance or tender of performance, (3) the defendant's breach of the contract, and (4) the plaintiff's damage as a result of the breach." Prime Products, Inc. v. S.S.I. Plastics, Inc., 97 S.W.3d 631, 636 (Tex. App. – Houston [1st Dist.] 2002 pet. filed) (citations omitted).

Plaintiff alleges that in December, 1999, Southern Foods, through Rick Beamon, spoke with Mr. Purl, the President of F Street, and agreed to reimburse F Street's expenses incurred for the 1999 Christmas party at the Harlingen and Corpus Christi plants. The only evidence Plaintiff submits is the affidavit of Mr. Purl, in which he states:

> In December, 1999, I spoke on the telephone with Rick Beamon . . . . Mr. Beamon told me that his company would reimburse all of F Street's expenses incurred for the 1999 Christmas parties at the Harlingen and Corpus Christi plants. The total of F Street's expenses incurred for the 1999 Christmas parties at the Harlingen and Corpus Christi plants was $7,135.00. As of the date of this affidavit none of these incurred expenses have been reimbursed by Defendants.

See Pl's Motion for Partial Summary Judgment, at Ex. C, ¶¶ 24-25.

Plaintiff's evidence consists entirely of the statement of Mr. Purl. The affidavit does not sufficiently discuss the circumstances for the communication, the terms of the agreement, facts indicating a meeting of the minds occurred, each party's consent to the terms of the agreement, or the execution of the contract with the intent that it be mutual and binding. Defendants do not deny that a contract exists. Rather, they point out that Plaintiff has not shown that a valid enforceable contract existed between the parties. Defendants argue Plaintiff fails to demonstrate the element of mutuality of obligations supporting the contract between the parties. See Defs' Response to Pl's Mot., at p. 20 [Dkt. No. 12].

This affidavit is inadequate to support a claim for breach of contract. Plaintiff's affidavit still does not allege facts that would demonstrate an enforceable oral contract existed, nor has Plaintiff provided any documentation of the expenses incurred, except to conclude the total amount incurred was $7,135.00. See Southwell v. University of Incarnate Wood, 974 S.W.2d 351, 354-55 (Tex. App. – San Antonio 1998, pet. denied). See Michaels v. Avitech, Inc., 202 F.3d 746, 754-55 (5th Cir. 2000) (citing Krim v.

14

BancTexas Group, Inc., 989 F.2d 1435, 1449 (th Cir. 1993)). Defendants, therefore, argue that there is an absence of evidence supporting Plaintiff's claim. In response, Plaintiff was required to produce summary judgment evidence raising a genuine issue of material fact on each element. See Prime Products, Inc. v. S.S.I. Plastics, Inc., 97 S.W.3d at 636 (holding an affidavit that did not set out facts that stated the terms of the alleged promises was insufficient to create a fact issue). Because Plaintiff failed to sufficiently set out facts that create a fact issue on each element of the alleged oral agreement, Plaintiff's Motion for Summary Judgment on this claim must fail. As a result, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendants' Motion for Summary Judgment on the breach of contract claim concerning the Christmas party claim.

VI.

### Conversion Claim for Failure to Return or Pay for Ice Cream Dollies

Plaintiff alleges Defendants' Wichita Falls branch did not return ice cream dollies worth $6,325.02. Further, Plaintiff contends that had these dollies been returned, they would have been considered inventory under the Asset Purchase Agreement and thus would have increased the sale price. See Pl's Motion for Partial Summary Judgment, at p. 12; Ex. C, at ¶ 26. Plaintiff's claim fails for the same reasons -- Mr. Purl's affidavit is conclusory and simply states, "Defendants' Wichita Falls branch owes Hygeia Dairy $6,325.02 for ice cream dollies that were not returned." Id. Plaintiff not only provides no evidence of the worth of the ice cream dollies, but it also does not demonstrate the dollies would have actually been considered inventory under the Asset Purchase Agreement, and thus would have increased the purchase price of F Street had they been returned. F Street itself quotes the elements of a cause of action for conversion under Texas law:

> Conversion is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with the owner's rights. In order to prevail, the plaintiffs must show that, at the time of the conversion, they were the legal owners, had legal possession, or were entitled to legal possession of the property. Additionally, they must demand return of the property and demonstrate the defendant's refusal to do so.

<u>W.G. Pettigrew Distributing Co. v. Borden, Inc.</u>, 976 F. Supp. 1043, 1057 (S.D. Tex. 1996) (citations omitted).

Plaintiff has failed to demonstrate the ice cream dollies were in Defendants' possession before the sale of F Street, that Plaintiff demanded return of the property, or that Defendants refused to return the property after the demand was made. As a result, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendants' Motion for Summary Judgment on the conversion claim concerning the alleged failure to return the ice cream dollies.

VII.

<u>Remaining Incidental Claims -- Conversion, Interest, and Attorneys' Fees</u>

Because the Court has concluded Plaintiff failed to demonstrate a claim for the Accounts Receivable or a breach of the Escrow Agreement, Plaintiff's claims for conversion relating to these claims also fails. Additionally, Plaintiff has asserted no right to interest or attorneys' fees.

VIII.

<u>Antitrust Claims</u>

Defendants argue in their Motion for Summary Judgment that F Street cannot establish the requisite elements of its Antitrust claims. <u>See</u> Defs' Motion for Summary Judgment, at p. 12 [Dkt. No. 10]. As a preliminary matter, Plaintiff argues Defendants' Motion for Summary Judgment on the Antitrust claims is premature and should not be considered at this time. <u>See</u> Pl's Response to Defs' Motion for Summary Judgment, at p. 1 [Dkt. No. 13].[3] Plaintiff asserts that at the Initial Pretrial Conference, the parties agreed to bifurcate the contract and antitrust claims for the purpose of discovery and

---

[3]Defendants correctly point out F Street's Response to Defendants' Motion for Summary Judgment was not timely filed with the Court because it was not filed or served until October 3, 2002. Plaintiff did not seek leave to submit the respone out of time. Chamber Rule 5(F) states that an untimely motion will be stricken when it is not accompanied by a motion for leave. As a result of the untimeliness of Plaintiff's motion, the Court did not consider Plaintiff's substantive responses to arguments Defendants raised in their Motion for Summary Judgment. In the interests of justice, however, and in light of the separated dates included in the scheduling order, the Court reviewed Plaintiff's argument concerning the timing of Defendants' Motion for Summary Judgment on the Antitrust claims.

dispositive motion deadlines. As Plaintiff notes, however, this Court's scheduling order does not explicitly state that antitrust and contract claims are bifurcated. Defendants disagree with Plaintiff's characterization of the two discovery deadlines contained in the scheduling order. Defendants correctly point out the scheduling order delineates the deadlines with the following notation: "Initial Dispositive Motions Deadline (Before Designation of Experts)." This initial deadline was set for September 10, 2002. The second dispositive motion deadline was set for April 15, 2003. See Scheduling Order [Dkt. No. 8].

A review of the record of the Initial Pretrial Conference and the minutes reveals that Plaintiff told the Court two phases for discovery were expected with the first dealing with the breach of contract claims resulting in the submission of corresponding dispositive motions and the second phase involving discovery for the antitrust claims, review by experts and the submission of corresponding dispositive motions. Although the scheduling order is not a bastion of clarity concerning whether discovery was to be bifurcated, it is reasonable to expect that any dispositive motion Plaintiff would eventually submit for the antitrust claims would require extensive discovery after the designation of experts. Additionally, the parties Joint Discovery/Case Management Plan under Federal Rule of Civil Procedure 26(f) indicates that "plaintiff anticipates structuring discovery in phases, concentrating in the first phase on the plaintiff's contract claims and filing a motion or motions for partial summary judgment on those claims, and focusing in the second phase on plaintiff's antitrust claims." See Joint Discovery/Case Management Plan, at p. 2, ¶ 9A [Dkt. No. 6]. Paragraph 9 of this plan requires the parties to describe the *agreed* discovery plan, and Defendants did not indicate they disagreed with structuring discovery in phases.

Defendants make several other arguments concerning the timeliness of their Motion for Summary Judgment on the antitrust claims. Defendants suggest the "alleged 'agreement' [for bifurcated discovery] is belied by the fact that in June 2002, F Street served written discovery requests on Defendant specifically directed at the antitrust claims." Defs' Reply in support of Defs' Motion for Summary Judgment, at p. 3 [Dkt. No. 14]. The Court does not now determine whether there was officially an agreement between counsel concerning the phases of discovery. It notes, however,

that those interrogatories concerning Plaintiff's antitrust claims cited by Defendants do not preclude the possibility that the majority of Plaintiff's *expert* discovery would take place later in preparation for the April 15, 2003, dispositive motion deadline. The Court agrees with Defendants that generally in order to secure an extension for the response filing time in a motion for summary judgment, the party must comply with Federal Rule of Civil Procedure 56(f).[4] The separated dates on the scheduling order, the Joint Case Management plan, and the minutes from the Initial Pretrial Conference, however, lead this Court to act cautiously and conclude Defendants' Motion for Summary Judgment on the antitrust claims is premature. Given Plaintiff's position concerning a possible bifurcation of the discovery process, it is possible that Plaintiff did not request an extension under Rule 56(f) because counsel believed the second deadline for dispositive motions negated the necessity for such a request. If the Court's presumption is correct, Plaintiff was in error.

Requests for extensions of time to respond to a summary judgment motion should include an affidavit and demonstrate why the party needs addtional time for discovery and how that discovery will create a genuine issue of material fact. See Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 535 (5th Cir. 1999). Nevertheless, some courts have suggested that a request for relief under Rule 56(f) may take an alternate form other than an affidavit. See, e.g., Cacevic v. City of Hazel Park, 226 F.3d 483, 488 (6th Cir. 2000); Pfeil v. Rogers, 757 F.2d 850, 856 (7th Cir. 1985). Despite Plaintiff's failure to include such an affidavit, it has sufficiently demonstrated a justification for more discovery. The Court notes that it is a limited circumstance indeed where a Rule 56(f) extension will be granted without the presence of an accompanying affidavit and explicit reasons supporting the need for more discovery. In this instance, however, Plaintiff has complied with the substantive

---

[4]Rule 56(f) states: "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." See also Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1442 (5th Cir. 1993).

requirements of the rule. As a result, the Court **DENIES without prejudice** Defendants' Motion for Summary Judgment on the antitrust claims. The parties may reurge their Motions for Summary Judgment on the antitrust claims no later than April 15, 2003, the second dispositive motion deadline contained in the scheduling order.

Finally, the Court notes the parties requested an extension of the mediation deadlines earlier in the litigation process [Dkt. No. 11]. Should the parties feel mediation is approriate on the remaining claims, the parties may submit a joint motion making such a request.

DONE this 31st day of March, 2003, at Brownsville, Texas.

Hilda G. Tagle
United States District Court Judge